# Illinois Official Reports

## Appellate Court

***People v. Ybarra*, 2016 IL App (1st) 142407**

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MARTIN YBARRA, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>Docket No. 1-14-2407 |
| Filed | November 3, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-CR-5916; the Hon. Steven J. Goebel, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Jennifer Bontrager, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Janet C. Mahoney, and Eric Leafblad, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE McBRIDE delivered the judgment of the court, with opinion.<br>Presiding Justice Ellis and Justice Howse concurred in the judgment and opinion. |

¶ 1        Following a May 2014 jury trial, defendant Martin Ybarra was found guilty of three counts of first degree murder in the February 2009 shooting deaths of 17-year-old Kendrick Pitts, 13-year-old Johnny Edwards, and 15-year-old Raheem Washington. The trial court subsequently sentenced defendant to a mandatory term of natural life in prison. Defendant appeals, arguing that the imposition of a mandatory natural life sentence is unconstitutional as applied to him under the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) because the trial court lacked discretion to consider mitigating evidence.

¶ 2        Because defendant has raised a single sentencing claim, we shall discuss the evidence presented at trial as necessary to understand the facts of the case. In February 2009, defendant was arrested and subsequently charged with the first degree murders of Kendrick Pitts, Raheem Washington, and Johnny Edwards.

¶ 3        In February 2009, there was an ongoing dispute between rival gangs, the Latin Kings and the Black P Stones on Chicago's south side. Dominique Atkins testified that in February 2009, he was a member of the Black P Stones, but had previously switched allegiance between the Latin Kings and the Black P Stones. Atkins stated that he previously dated defendant's sister Veronica Ybarra and was familiar with defendant. On February 20, 2009, Atkins received a call from Carnell Pitts, a fellow Black P Stone, asking Atkins to meet Carnell's younger brother Kendrick Pitts at school and walk him home from Bowen High School. Bowen High School is located near East 89th Street and South Muskegon Avenue in Chicago.

¶ 4        While Atkins was waiting for school to end, he observed a fight start between members of the Latin Kings and Black P Stones. He saw a small dark colored car pull up to the school and members of the Latin Kings yelled gang slogans. Atkins joined the fight and briefly fought a rival Latin King. The fight was broken up by the Bowen safety officer. Atkins then started to walk Pitts home. They were walking north on South Exchange Avenue toward East 87th Street when Atkins observed the same dark colored car stop in the middle of the street.

¶ 5        Atkins testified that he thought there was going to be another fight so he took off his jacket and walked into the street. He stated that a Latin King exited the vehicle and the two postured as though there would be a fight, but no fight occurred. Atkins then walked away. As he was bent over to pick up his jacket, Atkins testified that he heard someone say to look up. Atkins heard gunshots and saw defendant 25 feet away. Atkins stated that defendant was wearing a red jacket and holding a large rifle. Atkins said defendant fired the rifle at him. Atkins then ran toward the corner of 87th Street and Exchange Avenue and told Pitts to follow him. Atkins ran westbound on 87th Street and then saw the same car come out of the alley between Exchange Avenue and Escanaba Avenue. The car began to chase them, and Atkins saw the rifle come out of the passenger window. He ran through a vacant lot and jumped into a garbage dumpster to hide. He heard three or four additional gunshots while hiding.

¶ 6        When he exited the dumpster, Atkins realized that Pitts was not with him. He walked through the vacant lot and observed Johnny Edwards, who had been shot. Atkins thought Edwards was still alive at that time because he heard Edwards's brother ask for help. Atkins testified that he called 911 and remained on the scene. Atkins identified defendant in a photo array that night and a few days later, he identified defendant in a lineup.

¶ 7        The State presented testimony from four disinterested eyewitnesses to the shooting. Noe Maciel testified that on February 20, 2009, he lived at 8717 South Exchange Avenue. At around 3 p.m., Maciel was in his apartment and heard shots from outside. He looked out his window to see a young black man, later identified as Raheem Washington, standing behind Maciel's Lincoln Navigator. He then observed defendant wearing a red jacket and holding a rifle. Maciel saw defendant fire the rifle toward Washington. The shot shattered the window of his Navigator. Washington ran out of his view and then Maciel saw defendant run towards a gangway. Maciel called 911 and went outside to see the damage to his vehicle. When he got outside, he heard a woman call out and saw Washington lying on the ground in the gangway. Maciel identified defendant in a photo array that evening, and later he identified defendant as the shooter in a lineup.

¶ 8        William Brown testified that on February 20, 2009, he was working at his automotive repair shop at 87th Street and Exchange Avenue. He heard a commotion and went outside. Brown stated that he saw a group of Hispanic men arguing with an African-American man on the corner. One Hispanic man stood face-to-face with the African-American man, but after a minute or two, the African-American turned away. Brown said the Hispanic men got back in the car and drove east. About a minute later, Brown heard five gunshots and ducked behind a dumpster. He observed kids running and heard more gunshots.

¶ 9        Lilia Esquivel testified that at around 3 p.m. on February 20, 2009, she was walking westbound on the north side of 87th Street with her three children. As she was nearing the intersection with Exchange Avenue, she heard what she initially thought was fireworks. Esquivel crouched down with her children. As she was bent down, she observed a person in a red shirt holding a long gun. When the shots stopped, she saw several African-American people running toward 87th Street. She saw a dark blue car exit the alley and turn westbound on 87th Street. She was approximately 20 to 25 feet away. Esquivel observed one of the occupants of the vehicle lean out of the car and fire at the group of African-Americans she had seen running. Esquivel testified that she thought it was the same shooter as earlier, but the first time she saw him, she did not see his face and the second time she only saw the profile. Esquivel then continued home and observed Pitts's body lying on the sidewalk in front of her house. Esquivel did not identify defendant in a photo array. When she viewed the lineup, Esquivel indicated that she "thought" defendant was the shooter, but she was "not 100 percent."

¶ 10       Hamon Charleson testified that at around 3 p.m. on February 20, 2009, he was at a bus stop near 87th Street and Escanaba Avenue with his sister-in-law when he heard gunshots. He observed several school children running towards him on the north side of 87th Street. Charleson then saw a dark car pull out of the alley between Escanaba Avenue and Exchange Avenue and turn west on 87th Street. He saw the torso of the shooter leaning out of the passenger side of the car with a rifle. Charleson heard defendant shouting racial expletives, "run, n***, run; die, motherf***, die; die, n***, die." Charleson testified that he observed defendant shoot Pitts in the head. The bus arrived during the shooting, and Charleson placed his sister-in-law on the bus. Charleson subsequently identified defendant in a photo array and lineup as the shooter.

¶ 11       Pitts was pronounced dead on the scene. Washington and Edwards died later that day at the hospital. Based on the information from Atkins and other witnesses, the police identified

defendant as a possible suspect. The police went to his house at 8321 South Buffalo Avenue in Chicago, but defendant was not at home.

¶ 12 Veronica Ybarra, defendant's sister, and Adolfo Hernandez, Veronica's boyfriend at the time of the shooting and a Latin King, testified at trial. Each refuted their prior handwritten statement and grand jury testimony. The witnesses each alleged threats or physical abuse by the police, but neither reported to anyone at the time the statements or testimony was given that they were under duress. Their respective statements and grand jury testimony were also admitted at trial.

¶ 13 Veronica testified that in February 20, 2009, she lived at 8321 South Buffalo Avenue with her family, including defendant and Hernandez. Defendant and Hernandez were members of the Latin Kings. In her statement and grand jury testimony, Veronica stated that on February 20, 2009, defendant left home at approximately 2 p.m. to go to Bowen High School. She later received a call from defendant who told her to get "the thing," which she understood to be the AK-47 under defendant's bed. She retrieved the rifle from under defendant's bed and brought it downstairs. She saw an old blue car pull up, and she handed the gun to Geovanni Lopez. She saw defendant in the car wearing a red sweater. Lopez got back in the car and they drove away. Veronica then went to the clinic for an appointment. Later that evening, she observed defendant watch the news about the shooting with Hernandez. Veronica saw her father hide the rifle in a duffle bag with clothes and leave the apartment. Defendant and Hernandez left the apartment.

¶ 14 In his statement and grand jury testimony, Hernandez stated that he lived with defendant and his family in February 2009. On February 20, 2009, he went to the clinic with Veronica. When he returned home, he watched the news with defendant. Hernandez said that defendant smiled when the story of the shootings came on television and indicated to Hernandez that he shot the victims. Later that evening, Hernandez left with defendant to spend time with his friend Carlos Silva. While he was with Silva, Hernandez received a call from Veronica, informing him that the police had been looking for him. Hernandez stated that Silva suggested they spend the night at his girlfriend's house in East Chicago, Indiana. The next day, they went to a Budget Motel in Gary, Indiana.

¶ 15 The rifle was subsequently recovered by the police with assistance from defendant's father. It was found in a duffle bag hidden inside a plastic playhouse located in a debris-filled garage. No latent fingerprints were recovered from the rifle. An incomplete DNA profile was recovered, and defendant could not be excluded, but the incomplete profile could match one in seven unrelated Hispanic males.

¶ 16 Following closing arguments, the jury found defendant guilty of three counts of first degree murder. Defendant filed a motion for a new trial, which the trial court denied.

¶ 17 At the sentencing hearing, both parties presented evidence in aggravation and mitigation. The State presented victim impact letters for Washington and Edwards. Defendant presented a mitigation packet with detailed information about defendant's childhood. According to the document, defendant grew up in extreme poverty. His father had been a gang member and abused drugs. His father physically abused his mother and, in turn, his mother physically struck his eldest sister on at least one occasion. Defendant had a low IQ, with developmental disabilities, and consistently performed poorly in school. Defendant's mother may have used cocaine and smoked cigarettes while defendant was in utero. Defendant also was repeatedly exposed to lead fumes as a child.

¶ 18 Defense counsel conceded that defendant was subject to a mandatory sentence of natural life, but argued that the law may change in the future and asked the trial court to consider the mitigating evidence. The trial court acknowledged the mandatory sentencing, but discussed the evidence presented at trial and indicated that it reviewed the mitigating evidence. The court held that even if it had discretion in imposing the sentence, it would still sentence defendant to natural life. The court then imposed the mandatory natural life sentence. Defendant filed a motion to reconsider his sentence, which the trial court denied.

¶ 19 This appeal followed.

¶ 20 Defendant raises a single issue on appeal, arguing that his mandatory natural life sentence violates the proportionate penalties clause of the Illinois Constitution. Specifically, defendant contends that the mandatory natural life sentence is unconstitutional as applied to him under the proportionate penalties clause of the Illinois Constitution because it precluded any opportunity for defendant to be returned to useful citizenship and it prevented the trial court from considering the mitigating evidence presented.

¶ 21 Recently, the sentencing jurisprudence for juvenile offenders has been evolving in the United States Supreme Court. See *Roper v. Simmons*, 543 U.S. 551 (2005), *Graham v. Florida*, 560 U.S. 48 (2010), and *Miller v. Alabama*, 567 U.S. ___, 132 S. Ct. 2455 (2012).

> "In *Roper*, the Supreme Court held that the eighth amendment prohibits the death penalty for juvenile offenders. *Roper*, 543 U.S. at 568. The Court reasoned that the 'death penalty is reserved for a narrow category of crimes and offenders,' and that 'juvenile offenders cannot with reliability be classified among the worst offenders.' *Id.* at 569. In *Graham*, the Supreme Court held that the eighth amendment forbids a sentence of life without the possibility of parole for juveniles who did not commit homicide. *Graham*, 560 U.S. at 74 ***. The Court said that, although the state is not required to release a juvenile during his natural life, the state is forbidden 'from making the judgment at the outset that those offenders never will be fit to reenter society.' *Id.* at 75 ***. *** In *Miller*, the Supreme Court held that the eighth amendment prohibits a sentencing scheme that mandates life in prison without the possibility of parole for juvenile offenders, including those convicted of homicide. *Miller*, 567 U.S. at ___, 132 S. Ct. at 2469. The Court stated that a judge must have the opportunity to look at all of the circumstances involved before determining that life without the possibility of parole is the appropriate penalty. See *id.* at ___, 132 S. Ct. at 2469." *People v. Harmon*, 2013 IL App (2d) 120439, ¶ 48.

¶ 22 While defendant at the age of 20 was not a juvenile at the time of the offense, he contends that as a youthful offender, the same reasoning in the Supreme Court cases should be applicable to his case. Defendant was sentenced to mandatory natural life under section 5-8-1(a)(1)(c)(ii) of the Unified Code of Corrections. 730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 2008). Section 5-8-1(a)(1)(c)(ii) mandates a term of natural life for persons 17 years or older at the time of the commission of the murder and are found guilty of murdering more than one victim. *Id.*[1]

¶ 23 The proportionate penalties clause of the Illinois Constitution provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of

---

[1]The current version of section 5-8-1(a)(1)(c) applies to defendants who have "attained the age of 18." 730 ILCS 5/5-8-1(a)(1)(c) (West Supp. 2015).

restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. "While courts of review are generally reluctant to override the judgment of the General Assembly with respect to criminal penalties [citation], it is also true that when defining crimes and their penalties, the legislature must consider the constitutional goals of restoring an offender to useful citizenship and of providing a penalty according to the seriousness of the offense [citation]." (Internal quotation marks omitted.) *People v. Miller*, 202 Ill. 2d 328, 338 (2002). "With regard to the statute at issue, we have recognized that the legislature considered the possible rehabilitation of an offender who commits multiple murder[s], and the seriousness of that offense, in determining that a mandatory minimum sentence of natural life imprisonment is appropriate for the offense of multiple murders." *Id.*

> "We have recognized three different forms of proportionality review. A statute may be deemed unconstitutionally disproportionate if (1) the punishment for the offense is cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community; (2) similar offenses are compared and the conduct that creates a less serious threat to the public health and safety is punished more harshly; or (3) identical offenses are given different sentences." *Id.*

¶ 24    Here, defendant argues that the imposition of a mandatory sentence of natural life "shocks the moral sense of the community." Defendant points out his young age, as well as his history from the mitigation report, including his low IQ, his poor performance in school, his family's extreme poverty, exposure to lead, and abusive family life. Defendant also relies on this court's recent decision in *People v. House*, 2015 IL App (1st) 110580, as support.

¶ 25    In *House*, the defendant was 19 years old with no history of violent crimes and was found guilty under a theory of accountability for the murder of two victims. *Id.* ¶ 101. Accordingly, the defendant was sentenced to a mandatory term of natural life under the same statute as defendant in this case, section 5-8-1(a)(1)(c)(ii). 730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 1998). We found it significant that the defendant's sentence involved the convergence of the accountability statute and the mandatory natural life sentence. *House*, 2015 IL App (1st) 110580, ¶ 89. We analyzed the reasoning behind the Supreme Court's recent decisions involving youthful offenders, as well as articles discussing the differences between youth and adults. *Id.* ¶¶ 90-100.

¶ 26    After considering the facts of the case, the recent Supreme Court decisions, and research on youthful offenders, we concluded that the defendant's sentence was unconstitutional as applied to his case. *Id.* ¶ 101. "Given defendant's age, his family background, his actions as a lookout as opposed to being the actual shooter, and lack of any prior violent convictions, we find that defendant's mandatory sentence of natural life shocks the moral sense of the community." *Id.*

¶ 27    We find the instant case distinguishable from *House* based on one significant difference. The defendant in *House* did not pull the trigger, but acted as a lookout and was found guilty under a theory of accountability. Our analysis specifically considered the union of mandatory sentencing with guilt under a theory of accountability. No such union exists in this case. While he was also a young adult at 20 years old, defendant was the person who pulled the trigger repeatedly and killed three teenagers on the street as they left school one afternoon. We cannot equate defendant's actions with our analysis in *House*. For this reason, we find our reasoning in *House* to be inapplicable to defendant's case.

¶ 28    Defendant also cites the decision in *People v. Gipson*, 2015 IL App (1st) 122451, as support. In *Gipson*, the defendant, who was 15 years old at the time of the offense, was

convicted of two counts of attempted first degree murder with the aggravating factor of personally discharging a firearm, for an aggregate sentence of 52 years. *Id.* ¶¶ 20, 23-24. Defendant focuses on the reviewing court's description of the crimes as the product of "rash decision making." *Id.* ¶ 73. However, the reviewing court considered the unique facts of that case and the defendant before concluding that the 52-year sentence was unconstitutional as applied to the defendant. "The court's choice was to see that defendant remain in prison for life or spend only the last few years of his life outside the prison walls, all for a crime that he committed at age 15, while his mental health was questionable at best, when it could not be said that he was irredeemable, and for a crime in which no one died." *Id.* ¶ 75.

¶ 29        However, we find *Gipson* distinguishable for several reasons. First, the defendant in *Gipson* was a juvenile. Second, the court acknowledged that the defendant had serious mental health issues and was prone to impulsive behavior. Significantly, the defendant had been falsely accused and hospitalized for the homicide of a child when he was 7 years old, and as the reviewing court observed, the "defendant's mental health issues were not appropriately addressed." *Id.* ¶ 74. Third, defendant in this case was convicted of the first degree murder of three victims, while the defendant in *Gipson* was convicted of attempted first degree murder. The seriousness of the crimes in the instant case cannot be diminished. Finally, we disagree with defendant's apparent comparison of "rash" actions between *Gipson* and the present case. Defendant's actions were not rash, but premeditated. He called home to have his sister get a semiautomatic assault rifle ready for defendant and his friends to retrieve. Defendant and his friends then drove over to the streets near Bowen High School shortly after dismissal and began firing on teenagers and pedestrians as they walked down the street. The car followed and chased victims as defendant fired. He ultimately killed three teenagers. These facts are not comparable to those present in *Gipson* and were not the result of "rash decision making."

¶ 30        We have reviewed the mitigation report submitted to the trial court and are sympathetic to defendant's struggles in both his family life and cognitive abilities. It is clear that defendant grew up disadvantaged in several ways, such as extreme poverty, a family history of drug abuse, exposure to toxic fumes, and learning disabilities in his education. Nevertheless, unlike the cases discussed above, defendant was a legal adult who was convicted as the actual shooter in the deaths of three unarmed teenagers, execution style. A mandatory sentence of natural life in this case does not shock the moral sense of the community and does not violate the proportionate penalties clause of the Illinois Constitution.

¶ 31        Moreover, we point out that the trial court did review the mitigating evidence at the request of defense counsel in imposing the sentence. Despite being bound by the mandatory sentencing statute, counsel specifically asked the trial court if it would consider the mitigating evidence as if the court had discretion in sentencing. Counsel noted the evolving jurisprudence regarding the eighth amendment and sought to make a record if the changes would potentially impact defendant's mandatory natural life sentence. Although defendant suggests on appeal and in oral argument that the trial court did not review the submitted mitigation report, the transcript from the sentencing hearing indicates that the court had read the report before proceeding to the hearing. The trial court honored defense counsel's request and conducted a "balancing test" should the evolution of the sentencing laws occur. The court specifically stated on the record that it considered "all factors in aggravation and mitigation which the Court is well aware of, I'm considering the arguments of counsel, obviously the evidence at trial, presentence investigation, victim impact statements."

¶ 32  In imposing a natural life sentence, the trial court made the following findings on the record.

> "First of all, Mr. Ybarra, you terrorized the streets of Chicago around Bowen High School by your actions. There were kids, obviously who you murdered, and other kids coming home from school, a place where kids should be safe and feel safe, feel comfortable, on their way home to do their homework, to go to after-school activities, to go to their homes where is a place where they should feel safe [*sic*]. And you totally destroyed that, you terrorized them, they were running, they were hiding, scared for their lives.
>
> And you killed three of those kids. You drove up and down the streets of Chicago there, near Bowen High School shooting at the kids like it was a sport. I'm here to tell you it's not a sport. You were using a semiautomatic assault rifle and those kids didn't have a chance. They just didn't have a chance.
>
> And as I heard the evidence, you behavior is incomprehensible to me, it's so antisocial and it is evil. The Court does not find any rehabilitative potential in you. You are a tremendous danger if you were to be free in the open society. And you should never be free.
>
> And the law obviously doesn't allow me to do that, and I want it clear for the record, I would not anyway allow you to be free. Even if the statute *** allowed me to give some discretion, you would get a sentence of life imprisonment from me.
>
> So based on your horrific actions, taking the life of Mr. Washington, Mr. Edwards and Mr. Pitts, this Court is sentencing you [to] natural life imprisonment for your actions and conduct on that day.
>
> Additionally, the words you uttered are also incomprehensible. The racist words you uttered and almost your glee in wanting to kill dampens my heart in what I heard. And it's hard for me comprehend and believe a human being could feel such animosity, such hatred toward other human beings. But that, I guess, is what gang life is."

¶ 33  Accordingly, the trial court explicitly held that even if it had discretion in defendant's sentence, it would still impose a sentence of natural life. Further, contrary to defendant's suggestion in his brief on appeal, the trial court indicated that it did consider the mitigating evidence alongside the evidence adduced at trial and the evidence in aggravation. The trial court concluded that defendant's actions in taking the life of three teenagers merited a natural life sentence. These findings further support our conclusion that defendant's sentence does not shock the moral sense of community and does not violate the proportionate penalties clause of the Illinois Constitution.

¶ 34  Based on the foregoing reasons, we affirm the decision of the circuit court of Cook County.

¶ 35  Affirmed.