2019 IL App (1st) 162016-U

No. 1-16-2016

Third Division
December 31, 2019

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Respondent-Appellee, | ) ) | |
| v. | ) ) | No. 86 CR 14929 (02) |
| | ) ) | Honorable |
| EARL HARRIS, | ) ) | Dennis J. Porter, Judge, presiding. |
| Petitioner-Appellant. | ) | |

_____

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Ellis and Justice McBride concurred in the judgment.

**O R D E R**

¶ 1     *Held*: The trial court's summary dismissal of defendant's postconviction petition was proper where the petition failed to allege a cognizable claim that his sentence was unconstitutional.

¶ 2     Defendant, Earl Harris, appeals the circuit court's dismissal denying leave to file a third petition for postconviction relief concerning his convictions for armed robbery and first degree murder committed in 1986 when he was 20 years old. Defendant was sentenced to life without the possibility of parole which he now alleges was unconstitutional in light of this

court's ruling in *People v. House*, 2015 IL App (1st) 110580.[1] For the following reasons, we affirm the circuit court's decision.

¶ 3                                I. BACKGROUND

¶ 4        Following a jury trial, defendant was found guilty of two counts of armed robbery and one count of first degree murder. A fourth charge of attempt murder was nol-prossed by the State after the jury could not reach a verdict. Defendant waived jury trial for the purposes of sentencing and the trial court subsequently sentenced defendant to natural life without possibility of parole on the murder conviction and two concurrent 30 year-terms on the armed robbery convictions. Defendant is challenging only his life sentence without parole. Accordingly, we will discuss the evidence from his jury trial only to the extent necessary to understand his sentencing claims.

¶ 5                                 A. Jury Trial

¶ 6        Defendant's conviction stems from an armed robbery gone wrong. The robbers, a group of four, included defendant, Michael Boyd, Patricia Bass, and Kevin Walton. The target was a tavern owned by the victim, Wojtek Rutkowski, and his wife, Halina. Around 2 a.m. on September 21, 1986, Maciej Grzyna was bartending for the Rutkowskis when he heard the sound of glass breaking. He turned towards the sound and saw a black man climbing across the bar. The man grabbed Grzyna's hair and held a gun to his head. Although in close proximity to the offender, Grzyna was unable to later positively identify defendant as the person who held the gun to his head.

---

[1]Defendant's petition for postconviction relief was filed on April 7, 2016 and cited *People v. House*, 2015 IL App (1st) 110580 as the basis for his petition. This opinion has since been vacated. See *People v. House*, No. 122134 (Ill. Nov. 28, 2018) (supervisory order). Briefing in this appeal was completed on May 22, 2019. A modified opinion was issued on June 27, 2019 but has not yet been released for publication. See *People v. House*, 2019 IL App (1st) 110580-B, pet. for leave to appeal pending, No.125124 (motion for extension of time for filing allowed to Sept. 30, 2019).

¶ 7      As Grzyna stood there, a woman came behind the counter and removed money from the cash register. Grzyna also saw the two remaining patrons in the tavern laying on the ground and two unknown individuals standing by the front door. Gryzna testified that the gunman began backing away while keeping the gun pointed at him. One of the patrons attempted to grab a barstool to hit the gunman, but was stopped by one of the men by the door. The patron dropped the barstool which crashed into the pool table. At this point, Wojtek ran into the tavern.

¶ 8      The Rutkowskis had been asleep in their apartment which was attached to the tavern. Wojtek came in through the rear door, dressed in only his underwear. He started shouting for the police when he was shot twice by the gunman. The gunman and woman ran out of the tavern and Grzyna turned his attention to Wojtek who had collapsed in the hallway. There was some conflicting testimony about Gryzna's description of the gunman, specifically the type of facial hair present. Defense counsel also contrasted Gryzna's earlier statements to the police that he was certain he could identify the gunman if he saw him again with the unsuccessful lineup conducted a month after the offense.

¶ 9      Halina testified that Wojtek woke up and ran to the tavern. She followed behind him and heard Wojtek shouting "police." She ran outside, thinking that she could use her neighbor's phone, before she remembered the tavern's kitchen also had a phone. As she was running to the kitchen, she saw Wojtek falling in the hallway. Around this time, she noticed her right arm was bleeding and later realized she had been hit by a bullet. Halina viewed a lineup in October but did not identify defendant. The two bar patrons did not testify, but the police testimony revealed that they had also viewed the lineup and were unable to identify

defendant. No forensic evidence conclusively tying defendant to the offense was entered into the record.

¶ 10 The State also presented testimony from Willie Anderson, who stated that defendant had disclosed to him his role in the armed robbery. Anderson was arrested on October 16, 1986 on separate armed robbery charges. Anderson later received a plea deal on those charges in exchange for his testimony against defendant. Anderson testified that he had known defendant for approximately eight or nine months. Defendant frequented the bar where Anderson worked, and although he did not know his last name, Anderson considered defendant a friend. In early October, Anderson ran into defendant at a liquor store that also functioned as a lounge, which they both frequented. Anderson and defendant spoke about the robbery on September 21, 1986, and defendant admitted he had shot the victim who was trying to run away. Defendant also named Boyd and Walton, by nickname, as participants in the robbery and made references to a "b***" that Anderson testified was a reference to Bass. Anderson also testified that he had seen defendant carrying a firearm, approximately three times prior, which matched the caliber of bullets (.380) which had killed Wojtek.

¶ 11 Defendant did not testify at trial, but a detective testified that defendant was arrested on October 20, 1986. The detective had interviewed defendant after he waived his Miranda rights. Defendant was also interviewed separately by an assistant state's attorney. Defendant gave an official statement, later that night, with the detective, two assistant state's attorneys, and a court reporter present which was transcribed and read into the record at trial.

¶ 12 The statement, recorded at 1 a.m. on October 21, 1986, began with a recitation of defendant's rights. Defendant stated that around 1 a.m. on September 21, Boyd had picked defendant up from the liquor store/lounge to participate in a "stick-up" of a tavern. Boyd

drove defendant, Bass, and Walton to the tavern, parking a block away. Defendant was aware of the plan to rob the tavern and that Boyd and Walton were carrying guns, a .380 and .44, respectively. At the tavern, Bass went in first, followed by defendant, and then Boyd and Walton.

¶ 13 Defendant stated that he went over the top of the counter to where the bartender was standing. Defendant acknowledged that his role in the robbery was "to make sure the bartender didn't try anything[.]" Bass also came behind the counter to get the money, but Boyd and Walton stayed by the door. Defendant stated that Boyd had "one man by the neck" and was threatening to shoot if the man moved. Walton was also "tangling" with another man who was trying to run out the door. Defendant testified he was standing there for about 30 seconds when Wojtek came in through the back door, in nothing but his underwear. Defendant stated that Boyd shot Wojtek once, and his gun jammed, but Boyd was able to fire a second shot after the jam.

¶ 14 Defendant stated that after the shots were fired, Walton ran out the door first, followed by defendant, then Boyd, and the last to leave was Bass. The four ran to Boyd's car and then drove to Boyd's house where they divided the money, each taking approximately $30. Defendant's statement ended with him confirming he was speaking of his own free will and had been treated well while in custody.

¶ 15 At the close of evidence and arguments, the court instructed the jury. The instructions included Illinois Pattern Jury Instructions, Criminal, No. 5.03 (1986) which read, "A person is legally responsible for the conduct of another person when, either before or during the commission of an offense, and with the intent to promote or facilitate the commission of an

offense, he knowingly solicits, aids, abets, agrees to aid, or attempts to aid the other person in the planning or commission of an offense." The court also instructed the jury that,

"To sustain the charge of murder, the State must prove the following propositions: First, that the Defendant, or one for whose conduct he is legally responsible, performed the acts which caused the death of Wojtek Rutkowski; and Second, that when the Defendant, or one for whose conduct he is legally responsible, did so, he intended to kill or do great bodily harm ***; or he knew that his acts would cause death or great bodily harm; or he knew that his acts created a strong probability of death or great bodily harm***; or he [was] committing the offense of armed robbery."

The jury verdict, signed by all members of the jury, in contrast simply stated, "We, the jury, find the defendant, Earl Harris, Jr., Guilty of the offense of Murder."

¶ 16                                B. Sentencing Hearing

¶ 17        Defendant was eligible for the death penalty because he was 20 years old at the time of the offense and the court found that an aggravating factor, as outlined in section 9-1(b)(6), was present in the circumstances of the murder. See Ill. Rev. Stat. 1985, ch. 38, ¶ 9-1(b)(6)). However, the court did not impose the death penalty and sentenced defendant under the applicable statutory terms which provided that sentences for murder "shall be not less than 20 years and not more than 40 years" unless the court found aggravating factors, then, "the court may sentence the defendant to term of natural life imprisonment[.]" Ill. Rev. Stat. 1985, ch. 38, ¶ 1005-7-8.

¶ 18        At the sentencing hearing, the State presented evidence from seven Chicago police officers regarding defendant's criminal history as a teenager. These offenses included

burglary of a school, robbery, residential burglary, "strong armed robbery," and aggravated battery. The State also urged the court to consider the facts of the crime, the seriousness of the offense, and defendant's presentencing investigation report.

¶ 19    The presentencing investigation report reflected defendant's convictions as an adult, including counts of theft, retail theft, disorderly conduct, and criminal damage to property. A record of defendant's other arrests which did not result in convictions was also attached. Defendant did not complete his last year of high school, citing "family difficulties," but he had aspirations to take vocational courses in electronics or welding. He did not work regularly, but had held part-time jobs in the past. Prior to his arrest, defendant received "general assistance" which amounted to $154 per month. Defendant admitted gang membership, but only from 1984 to 1985, and denied having any physical or mental health issues. He also stated he had tried marijuana at 18, but did not continue smoking. He could not remember when he started drinking, but denied any problems with alcohol or other drug use. He mostly got along with his family, but had some problems with his dad who he felt was too strict.

¶ 20    Defendant's mother testified that defendant was the oldest of seven children, he had not completed high school beyond the 11th grade, and he lived with her and five of his siblings at the time of the offense. She had divorced defendant's father when defendant was two years old, but defendant had contact with his father and had lived with him for some time as a teenager. When defendant was in school, his mother considered him an average student with his grades in the B-C range, and she stated she "never had to go to school for him" implying that he did not cause any trouble at school. She further testified that defendant was non-violent, well behaved, and helped around the house with laundry, cooking, and cleaning. She

acknowledged that he had been arrested a few times in 1980 and even served one or two years at the Department of Corrections in St. Charles as a juvenile, but he had also worked part-time and contributed to the household after dropping out of school.

¶ 21     After her testimony, the court responded that it could not see how defendant's mother could testify defendant was "well behaved" where she was aware of his multiple arrests resulting in time served in the Department of Corrections. The court continued, stating that it found defendant had been the "primary mover" in the murder and there was no strong provocation justifying the offense, especially where the victim was unarmed. The court noted that it would not be an excessive hardship on defendant's family if he was incarcerated as he did not work consistently and was not an "earner" for the household. The court also commented that defendant's background was full of misdemeanors which was an indicator of his character and attitude. The court found that defendant had not expressed any remorse for killing the victim. Defendant was given the opportunity to address the court and admitted to the foolishness of his past crimes. However, he insisted he was innocent of murder and asked the court to consider that no witness had clearly identified him as the shooter responsible for the victim's death. The court responded that it had considered all the evidence presented at trial which the court had earlier concluded sufficiently supported finding defendant was the shooter.

¶ 22     The court continued and called defendant, "a dangerous young man" who was "not fit to mingle with other human beings, except those who are exactly like you." The court further stated that defendant had "got[ten] worse" as he aged, and had committed an unnecessary, cold-blooded murder. The court noted it would "take into consideration [defendant's] age" and acknowledged that defendant's criminal history involved nonviolent offenses, the

majority of which occurred when defendant was a juvenile. Nonetheless, the court's thinking was affected by the seriousness of the crime; thus, the court ordered a life sentence instead of the death penalty.

¶ 23                              C. Postconviction Challenges

¶ 24        Defendant's convictions and life sentence were affirmed by this court over his challenges on direct appeal concerning prosecutorial misconduct, abuse of discretion in sentencing, and disparate sentencing compared to other parties involved in the robbery. Defendant's first *pro se* petition for postconviction relief in 1995 claimed ineffective assistance of trial and appellate counsel, denial of his right to testify, and prosecutorial misconduct. However, the petition was dismissed for raising issues that should have been challenged, or were already dealt with, in his direct appeal. The dismissal was affirmed on appeal. In 2001, defendant sought leave to file a second petition for postconviction relief arguing that his sentence violated the principles established in *Apprendi v. New Jersey*, 530 U.S. 466 (2000). This petition was summarily dismissed as frivolous and patently without merit and the order was affirmed on appeal.

¶ 25        In 2016, defendant sought leave once again to file a successive petition for postconviction relief relying on this court's  decision in *House*, 2015 IL App (1st) 110580, to argue that his sentence violated the proportionate penalties clause of the Illinois Constitution. Defendant asserted that *House* recognized young adults, which includes persons between 18 and their mid-20s, are similar to juveniles for purposes of sentencing. Thus, he argues that his life sentence without parole, imposed under a statutory scheme which gave no consideration to his young age, was improper. The circuit court order, entered on June 10, 2016, found that *House* was narrowly decided and defendant could not demonstrate a basis for applying the

analysis in *House* to his case. Thus, the court dismissed defendant's petition as frivolous and patently without merit, where defendant could not demonstrate cause and prejudice to justify allowing the successive petition for postconviction relief. Defendant now appeals the court's dismissal and requests that this court vacate his sentence and remand for re-sentencing, or in the alternative, reverse the court's dismissal of his petition, assign counsel to his case, and remand for further postconviction proceedings.

¶ 26                                   II. ANALYSIS

¶ 27        The Post-Conviction Hearing Act (Postconviction Act) (725 ILCS 5/122-1 to 122-8 (West 2016)) provides a mechanism for criminal defendants to challenge their conviction or sentence by alleging a substantial denial of their rights under the United States Constitution, the Illinois Constitution, or both. *Id.* § 122-1(a)(1); *People v. Coleman*, 183 Ill. 2d 366, 378-79 (1998). Postconviction relief is limited to constitutional deprivations that occurred at the original trial or sentencing hearing. *Coleman*, 183 Ill. 2d at 380. "A proceeding brought under the [Post-Conviction Act] is not an appeal of a defendant's underlying judgment. Rather, it is a collateral attack on the judgment." *People v. Evans*, 186 Ill. 2d 83, 89 (1999). "The purpose of [a postconviction] proceeding is to allow inquiry into constitutional issues relating to the conviction or sentence that were not, and could not have been, determined on direct appeal." *People v. Barrow*, 195 Ill. 2d 506, 519 (2001).

¶ 28        Generally, a defendant may file only one postconviction petition. *People v. Davis*, 2014 IL 115595, ¶ 14; 725 ILCS 5/122-1(f) (West 2016). A defendant may file a successive postconviction petition upon obtaining leave of the court to do so. *People v. Edwards*, 2012 IL 111711, ¶ 24. Courts shall grant leave to file a successive postconviction petition where a defendant can establish "cause and prejudice." *Davis*, 2014 IL 115595, ¶ 14; 725 ILCS

5/122-1(f) (West 2016). Cause is established when "some objective factor external to the defense" impeded efforts to raise the claim in an earlier proceeding. *Davis*, 2014 IL 115595, ¶ 14. Prejudice is established when "a claimed constitutional error [occurred] that so infected the entire trial that the resulting conviction or sentence violates due process." *Id.* We review *de novo* the question of whether the defendant's pleadings satisfied the cause-and-prejudice test, such that the circuit court should have granted his motion for leave to file a second successive postconviction petition. See *People v. Edwards*, 2012 IL App (1st) 091651, ¶ 25.

¶ 29    Defendant raises only one issue on appeal, that Illinois courts have, in recent years, extended the protections offered to juvenile defendants in sentencing to "young adults," such as himself, where he was 20 years old at the time of his offense. Thus, he asserts that the circuit court erred in denying leave to file a successive petition for postconviction relief. Defendant maintains that his petition has sufficiently pled cause and prejudice where he was prevented from filing this claim earlier, as the jurisprudence did not exist at the time of his conviction and sentencing, and he was prejudiced by the unconstitutional life sentence without possibility of parole.

¶ 30    The State contends that the jurisprudence relied on by defendant does not go as far as extending protections, under the eighth amendment or the proportionate penalties clause, to young adults who, like defendant, received discretionary life sentences. Thus, the State asserts that leave to proceed with defendant's successive postconviction petition was properly dismissed because defendant could not establish a *prima facie* case for cause or prejudice.

¶ 31                                          A. Eighth Amendment

¶ 32      We first note that defendant's *pro se* petition for postconviction relief only contained allegations that his sentence violates the proportionate penalties clause of the Illinois Constitution; however, on appeal defendant also argues that his sentence violates the eighth amendment of the United States Constitution. Section 122-2 of the Postconviction Act requires that defendant "clearly set forth the respects in which petitioner's constitutional rights were violated." 725 ILCS 5/122-2 (West 2016). "Any claim of substantial denial of constitutional rights not raised in the original or an amended petition is waived." 725 ILCS 5/122-3 (West 2016).

¶ 33      Here, defendant's petition was dismissed in the first stage of proceedings which has a very low bar. *People v. Gaultney*, 174 Ill. 2d 410, 418 (1996) (To survive first-stage dismissal, a *pro se* petitioner need only present the "gist" of a constitutional claim, which is a "low threshold" requiring only a limited amount of detail in the petition.) "The question raised in an appeal from an order dismissing a post-conviction petition is whether the allegations in the petition, liberally construed and taken as true, are sufficient to invoke relief under the Act." *Coleman*, 183 Ill. 2d at 388. Thus, "a defendant may not raise an issue for the first time while the matter is on review." *Jones*, 211 Ill. 2d at 148.

¶ 34      Notwithstanding a party's waiver, our courts have long exercised the ability to reach issues in order maintain a sound and uniform body of precedent and arrive at a just result. See *People v. Jones*, 211 Ill. 2d 140, 145 (2004); Ill. S. Ct. R. 615(a) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court"). As eighth amendment and proportionate penalties challenges are often raised hand in hand, and defendant does reference the Supreme Court cases which discuss the

eighth amendment in his *pro se* petition, we will address the merits of defendant's arguments on appeal despite the narrow allegations specified in his petition.

¶ 35    The eighth amendment of the United States Constitution prohibits "cruel and unusual punishment" and is applicable to the states through the fourteenth amendment. U.S. Const., amends. VIII, XIV; *People v. Davis*, 2014 IL 115595, ¶ 18. "Cruel and unusual" refers not only to "inherently barbaric punishments" but those "disproportionate to the crime." *Graham v. Florida*, 560 U.S. 48, 59 (2010). In *Miller v. Alabama*, 567 U.S. 460, 465 (2012), the United States Supreme Court held that "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.'"

¶ 36    Defendant bases his eighth amendment challenge under *Miller* on an apparent judicial trend to denounce a bright-line rule at 18 years old. He also raises arguments that there is no real distinction between mandatory and discretionary in sentencing young offenders to life in prison. He argues that he should have been afforded a sentencing hearing which comports with the protections of the eighth amendment, giving consideration to his young age, diminished culpability, and other attendant circumstances of youth. Although defendant was 20 years old during the commission of the offense, he points to *House*, 2015 IL App (1st) 110580, *People v. Williams*, 2018 IL App (1st) 151373,[2] *Cruz v. United States*, 2018 WL 1541898 (D. Conn. 2018), and *State v. Sweet*, 879 N.W. 2d 811 (Iowa 2016), as support for his argument that *Miller* may be extended to "young adults" like himself.

---

[2]*People v. Williams*, 2018 IL App (1st) 151373, was vacated on February 2, 2019 after the Illinois Supreme Court issued a supervisory order directing the appellate court to consider the effect of *People v. Harris*, 2018 IL 121932, on the defendant's proportionate penalties claims. On remand, the matter was set for supplemental briefing and later resolved on summary disposition by agreed order without an opinion.

¶ 37    Defendant neglects this court's ruling in *People v. Pittman*, 2018 IL App (1st) 152030, which explicitly rejected extending an as-applied eighth amendment challenge under *Miller* to an adult offender, even if considered a "youthful" offender. 2018 IL App (1st) 152030, ¶¶ 29-31 (applying the reasoning from *People v. Thomas*, 2017 IL App (1st) 142557, where the court found that *de facto* life sentences for an 18-year-old defendant did not implicate the eighth amendment, to mandatory life sentences for adult offenders). The defendant in *Pittman* was 18 years old at the time he murdered three people and was sentenced to concurrent, mandatory natural life sentences on each conviction. *Id.* ¶¶ 16-18. Our supreme court has also rejected facial challenges seeking to extend *Miller* to offenders 18 or older. See *People v. Harris*, 2018 IL 121932, ¶ 61. Accordingly, we reject defendant's request to find that *Miller* may be extended to his case, where he was 20 years old at the time he committed murder.

¶ 38    We further note that the written opinions in *House*, 2015 IL App (1st) 110580, and *Williams*, 2018 IL App (1st) 151373, which defendant cites have since been vacated, and even if they had not been, neither case was decided on eighth amendment grounds. The court determined that the defendants had successfully raised as-applied challenges under the proportionate penalties clause of the Illinois Constitution. Although an analysis of the proportionate penalties clause is driven in part by considerations of *Miller* principles, they do not provide support for extending eighth amendment protections.[3]

¶ 39    Additionally, "decisions from our sister state courts are not binding on the courts of this state." *In re Scarlett Z.-D.*, 2015 IL 117904, ¶ 55 (citing *Illinois Bell Telephone Co. v.*

---

[3]Defendant also cites the modified opinion in *House*, 2019 IL App (1st) 110580-B, in his reply brief, for the same argument; however, the modified opinion, like the vacated 2015 opinion, does not decide the case on eighth amendment grounds and does not stand for the proposition that federal eighth amendment protections may be extended to those over 18 years of age.

*Industrial Comm'n*, 131 Ill. 2d 478, 489 (1989)). Even if we considered *Sweet*, the case from the Supreme Court of Iowa as persuasive authority, we cannot overlook the fact that it was decided under the Iowa Constitution's cruel-and-unusual punishment clause, see Iowa Const., art. 1, § 17, and adopted a categorical rule regarding life sentences for juvenile offenders. *Sweet*, 879 N.W. 2d 811, 839 (Iowa 2016). Thus, it is not helpful for finding a violation of the eighth amendment in defendant's case.

¶ 40        Lastly, defendant cites to a case in which a federal district court has specifically applied the *Miller* eighth amendment analysis to a defendant over the age of 18. In *Cruz*, the defendant was a gang member, having joined when he was 15, who was ordered to carry out a murder. *Cruz*, 2018 WL 1541898, *1. The defendant testified that he attempted to leave the gang before he was ordered to kill someone, but was unsuccessful and he feared reprisals for his "act of disrespect." *Id.* When the defendant was 18 years and 5 months old, he and another gang member shot and killed two people, one being the target of the kill order and the other, an unlucky friend of the target. *Id.* The defendant was convicted and given mandatory life sentences without parole for each murder in addition to sentences on racketeering convictions. *Cruz*, 2018 WL 1541898, *2.

¶ 41        The federal district court found that although *Miller* had announced a rule applicable to children under 18, it had not held that youth over the age of 18 could not be subject to the same rule. *Cruz*, 2018 WL 1541898, *14-15. The district court reasoned that judicial restraint, and the fact that *Miller* involved a juvenile defendant, limited the Supreme Court's ruling; but the Supreme Court's ruling is not contradicted by applying the same principles to young offenders over the age of 18. *Id.* The district court acknowledged that it was disagreeing with a number of other courts which had previously declined to apply *Miller* to

defendants 18 or over. *Cruz*, 2018 WL 1541898, \*16 (listing cases). However, the court noted its conclusion was supported by the extensive scientific evidence in the record before it regarding adolescent brain development as well as changes reflecting an emerging trend for treating 18-year-olds differently seen in legislative enactments, the statistics for actual use of mandatory life without parole sentencing, and other important societal lines distinguishing 18-year-olds from mature adults. *Cruz*, 2018 WL 1541898, \*16-22.

¶ 42    However, the district court explicitly declined to extend any consideration to 19-, 20-, or 21-year-old defendants. The court noted, "that it need only decide whether the rule in *Miller* applies to an 18-year-old." *Cruz*, 2018 WL 1541898, \*18. Thus, we find *Cruz* does not support defendant's argument. As we decline to extend the *Miller* eighth amendment analysis to a 20-year-old defendant, we need not address defendant's arguments regarding the distinction between a mandatory and discretionary sentence which is another distinguishing fact between defendant's sentence and the defendant in *Cruz*.

¶ 43                                    B. Proportionate Penalties

¶ 44    The Illinois Constitution provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, Art. I, § 11. To succeed on a claim under the proportionate penalties clause, the defendant must show either (1) that the punishment for the offense is cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community, (2) that similar offenses are compared and the conduct that creates a less serious threat to the public health and safety is punished more harshly; or (3) that identical offenses are given different sentences. *People v. Klepper*, 234 Ill. 2d 337, 348-49 (2009); see also *People v. Miller*, 202 Ill. 2d 328, 338 (2002) ("*Leon Miller*").

¶ 45    Defendant primarily asserts that his sentence is unconstitutional because it "shocks the moral sense of the community" where the court did not consider the characteristics of his youth and the effect of his youth on his conduct during the sentencing hearing. He mentions briefly several other arguments such as, the lack of opportunity for him to demonstrate growth and maturity, the lack of consideration given to his brain development as a young adult and his family circumstance, and the fact that the other robbers[4] received lesser sentences.

¶ 46    We examine *House*, which defendant attempts to analogize to his case, but we find it distinguishable. In *House*, the 19-year-old defendant was present and carrying a firearm when the victims, who were later executed, were forced into a vehicle at gunpoint, and he admitted to acting as the lookout. *House*, 2019 IL App (1st) 110580-B, ¶¶ 5, 34. The defendant was sentenced under a theory of accountability and received a mandatory life sentence because more than one victim was murdered. *Id.* ¶ 29. In finding the sentencing statute unconstitutional as applied to the defendant, this court noted that the defendant (1) was young, (2) was not present at the scene of the murder, (3) solely acted as a lookout, and (4) did not help in planning the crime. *Id.* ¶ 46. Moreover, this court noted that the defendant did not have a history of violent crimes, never knew his father, was raised by his grandmother, and did not graduate from high school. *Id.* ¶ 63. Lastly, this court found that although the trial court was able to consider these mitigating factors in declining to impose the death penalty, these mitigating factors were not available to the trial court in determining the term of sentencing due to the statutorily mandated life sentence. *Id.* ¶ 64. Therefore, this court determined that the defendant's mandatory sentence of natural life shocked the moral

---

[4]Defendant's challenge to the apparent disparity in sentencing was already addressed and rejected in his direct appeal and will not be re-examined here. See *People v. Harris*, 256 Ill. App. 3d 1100 (1994) (table) (unpublished order under Supreme Court Rule 23).

sense of the community and a new sentencing hearing was warranted to allow the trial court to consider relevant mitigating factors. *Id.* ¶¶ 64-65.

¶ 47    First, defendant touches briefly on a claim that he was charged under a theory of accountability and argues that the evidence and the jury verdict were ambiguous as to whether he was the shooter. We acknowledge that defendant was found guilty of murder by the jury. In a death penalty case, the court or jury must proceed after the guilty verdict to the sentencing phase and consider whether the State established any of the aggravating factors, beyond a reasonable doubt, and may only consider such evidence that would also have been admissible during trial. See Ill. Rev. Stat. 1985, ch. 38, ¶ 9-1. Accordingly, even if a jury instruction on accountability was given during the conviction phase of trial, the sentencing phase is considered separately.

¶ 48    As defendant waived jury trial for sentencing, it was proper for the trial court to make its own determination regarding the presence of aggravating factors. The trial court here found that the circumstances of the murder constituted an aggravating factor as listed under 9-1(b)(6). See Ill. Rev. Stat. 1985, ch. 38, ¶ 9-1(b)(6). Section 9-1(b)(6) provided that the defendant is eligible for the death penalty if the victim was killed during the commission of another felony (e.g. armed robbery), that the defendant actually killed the victim, and that the defendant intended to kill or knew of the strong probability that death or great bodily harm would occur. *Id.* Thus, the court found that defendant was actually responsible for the victim's death during the sentencing phase and he was not sentenced under a theory of accountability.

¶ 49    This court in *House* further noted that the "defendant's conviction under the theory of accountability weighed heavily in [its] conclusion that his mandatory natural life sentence

shocked the moral conscience of the community." *House*, 2019 IL App (1st) 110580-B, ¶ 32. Accordingly, we find that defendant's case is significantly different from *House* where the theory of accountability was not considered when the trial court determined his sentence. See also *People v. Ybarra*, 2016 IL App (1st) 142407, ¶ 27 (This court found that the reasoning in *House*, 2015 IL App (1st) 110580, was inapplicable where the 20-year-old defendant was the one who pulled the trigger).

¶ 50    Even if defendant was not the one who pulled the trigger, as he maintains, his level of culpability is greater than that of the defendant in *House*. Here, defendant was present at the scene of the murder and acted as more than a mere lookout. He went into the tavern, brandishing a firearm, with the intention of intimidating the bartender, to facilitate the robbery. He also knew that Boyd and Walton were carrying firearms. Therefore, defendant was aware of the strong probability that someone could be shot, die or be seriously injured during the robbery. Given the defendant's actions during the robbery, we distinguish his case from *House* and decline to find that his sentence violates the proportionate penalties clause.

¶ 51    We further note that defendant's sentence was imposed as an exercise of the trial court's discretion. The trial court had the discretion to consider mitigating factors and impose a lesser sentence. However, the court declined to do so. Defendant argues that the court did not consider the proper factors, which were detailed in *Miller* and have since been codified by the Illinois legislature. These factors include:

> "(1) the person's age, impetuosity, and level of maturity at the time of the offense, including the ability to consider risks and consequences of behavior, and the presence of cognitive or developmental disability, or both, if any; (2) whether the person was subjected to outside pressure, including peer pressure, familial pressure, or negative

influences; (3) the person's family, home environment, educational and social background, including any history of parental neglect, physical abuse, or other childhood trauma; (4) the person's potential for rehabilitation or evidence of rehabilitation, or both; (5) the circumstances of the offense; (6) the person's degree of participation and specific role in the offense, including the level of planning by the defendant before the offense; (7) whether the person was able to meaningfully participate in his or her defense; (8) the person's prior juvenile or criminal history; and (9) any other information the court finds relevant and reliable, including an expression of remorse, if appropriate. However, if the person, on advice of counsel chooses not to make a statement, the court shall not consider a lack of an expression of remorse as an aggravating factor."

730 ILCS 5/5-4.5-105(a)(1)-(9) (West 2018).

¶ 52 Defendant argues that the court should have considered how the circumstances of the offense are indicative of the impulsive nature of his young age at the time. He asserts that his role was minimal, continuing to deny that he was the shooter, and due to his reckless immaturity, he was easily encouraged by the prompting of the older Boyd to participate in the robbery. However, defendant has failed to allege any specific factors that would come out in a new sentencing hearing sufficient to change his sentencing outcome.

¶ 53 Even if special consideration was given to his family circumstance and the particular aspects of his young age, the record shows that defendant was 20 years old; he did not have mental or physical disabilities, addiction issues, a history of abuse or neglect, difficulty participating in his defense, or pressures from gang influences or family issues. It also shows that he had a criminal history as a juvenile and adult, which largely consisted of

misdemeanors. He had served time in the department of corrections as a juvenile and nevertheless returned to his criminal behavior exhibiting a diminished capacity for rehabilitation. Additionally, the trial court was better suited to determine defendant's degree of participation and specific role in the offense as well as the circumstances of the offense, a determination we will not second-guess here. The trial court also heard testimony from defendant's mother and reviewed the presentencing investigation report which did not exhibit any particular circumstances warranting leniency. At most, defendant stated his father was "too strict" and his parents had divorced. Even though his parents were divorced, there were no reports of abuse, neglect, or other childhood trauma. Defendant did not complete high school, but according to his mother, he did not have trouble in school through the 11th grade. The reasons for his dropping out of school are unclear, but afterwards he was able to hold down part-time jobs and contribute to the household. Thus, even giving consideration to the *Miller* factors as codified, we would not find a reason to reverse defendant's sentence.

¶ 54     Although we are sympathetic to defendant's hardship, where his foolish decision to participate in an armed robbery resulted in a murder conviction, it does not change the fact that defendant was legally an adult at the time of the offense. During sentencing, the trial court had the discretion to sentence defendant to as few as 20 years; however, the court chose to impose a life sentence without possibility of parole. In so doing, the court considered that defendant was the "primary mover," had a history of misdemeanors, and did not change his behavior after an earlier term in the department of corrections. We find that the discretionary life sentence imposed in this case does not shock the moral sense of the community and does not violate the proportionate penalties clause of the Illinois Constitution.

¶ 55                                   III. CONCLUSION

¶ 56          For the reasons stated, we affirm the dismissal of defendant's successive petition for postconviction relief.

¶ 57          Affirmed.