# Illinois Official Reports

## Appellate Court

---

### *People v. Pittman*, 2018 IL App (1st) 152030

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DENZEL PITTMAN, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>Docket No. 1-15-2030 |
| Filed | March 15, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-CR-00155; the Hon. Timothy J. Joyce, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Deepa Punjabi, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Tasha-Marie Kelly, and Brian A. Levitsky, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE McBRIDE delivered the judgment of the court, with opinion.<br>Presiding Justice Burke and Justice Gordon concurred in the judgment and opinion. |

**OPINION**

¶ 1      Following a bench trial, defendant Denzel Pittman was found guilty of the first degree murders of his girlfriend Jade Hannah, age 17; her mother Stacy Cochran, age 43; and her younger sister Joi Cochran, age 11. The trial court subsequently sentenced defendant to a mandatory term of natural life in prison. On appeal, defendant does not challenge his conviction but argues that the imposition of the mandatory natural life sentence violates the eighth amendment of the United States Constitution and the proportionate penalties clause of the Illinois Constitution because he was 18 years old at the time of the murders.

¶ 2      Because defendant does not challenge his conviction, we will discuss the evidence presented at defendant's March 2015 bench trial only as necessary to understand the facts of the case to consider his sentencing claims.

¶ 3      Defendant was arrested and charged with the stabbing deaths of Jade Hannah, Stacy Cochran, and Joi Cochran at their residence, located at 11106 South Bell Avenue in Chicago. The victims lived in a second floor apartment of a multiunit building comprised of six apartments, with two apartments on each floor. The family moved into the building in approximately August 2010. Linda Abraham lived on the second floor across the hall from the victims. The Thompson family, comprised of Arthur and Sherry Thompson, their daughter Courtney, and Courtney's son, lived in the first floor unit underneath Abraham's apartment.

¶ 4      On November 29, 2010, at approximately 9:40 p.m., Courtney Thompson arrived home from work and observed Jade sitting on the steps between the first and second floors with defendant. Courtney went into her apartment and heard Jade and defendant talking, but could not understand what they were saying. She began to work on a computer near the front door of the apartment. Her parents were in their bedroom watching television. A short time later, all three heard screams and a female child calling for her mother. Arthur got out of bed and opened the front door to the apartment. The screams had stopped when he opened the door. He immediately directed his wife to call 911. All three came into the hall and observed Jade lying face down on the landing between the first and second floors. Sherry was a nurse, and she attempted to resuscitate Jade after determining that Jade did not have a pulse. When Sherry turned Jade over, she observed stab wounds in her neck and chest. As she attempted CPR, Sherry noticed air coming from the stab wounds.

¶ 5      As Sherry was working on Jade, defendant came out of the victims' apartment and closed the door. He asked Sherry if the police had been called and if they saw who did it. He said he was going to find the offender. Courtney and Arthur observed blood on defendant's clothing. As he was leaving, he came back to retrieve his jacket, which was on the banister in the hallway. The Thompsons gave a description of the offender to police. Courtney and Arthur subsequently identified defendant as the individual leaving the victims' apartment in separate viewings of a lineup.

¶ 6      Abraham testified that she heard screams in her apartment and thought it was children playing. She went to her door and looked out her peephole. She observed a young man from the side with his fist moving rapidly up and down. She stated that it looked like the man was punching someone, but she was unable to see who or what he was punching. Abraham said the young man was holding up the person with his other hand. She did not observe a knife. She described the young man as African-American and medium height. As she watched, she observed the young man move out of sight into the apartment. She stepped away from the door

to change into clothing from nightwear. While she changed, she heard screaming from the back of the victims' apartment. She then looked through the peephole and saw the young man and did not hear any screaming. She testified that she was "distraught." She waited to open the door until it was quiet. When she opened the door, she heard voices that she recognized as the Thompsons. She came out and observed blood on the wall. She also observed Sherry attempting to resuscitate Jade. When the police arrived, they directed the officers to the apartment.

¶ 7　　Lieutenant Michael Ryan arrived on the scene right behind the paramedics. The paramedics immediately began to work on Jade but indicated to him that she was deceased. He went to the apartment and knocked. When he received no response, he entered the unit. He observed Stacy "laying in a pool of blood" just inside the unit. There were crutches nearby, which was later explained was due to Stacy's recent surgery. He went to the back of the apartment and observed Joi's legs also "in a pool of blood." He and an officer went through the apartment and determined that no one else was present. He stationed officers outside the apartment to keep the scene secure until the forensic team arrived. He then responded to a radio call of a sighting of the suspect. A forensic officer testified that the back door to the unit was closed and locked, stating that one of the locks required a key to open and the key was not present to open the door. He subsequently found a key and observed no damage to the door.

¶ 8　　Joseph Banks testified that he lived about three blocks from the scene. On November 29, 2010, at around 10:30 p.m., he was watching television with his wife when defendant walked up to their house and knocked on the door. He opened the inner door but left the outer door closed. He observed defendant as dirty, shaking, and out of breath. Defendant told Banks that he had lost his keys and asked to use their phone to make a call. Banks passed a phone to defendant on the porch. He heard defendant tell his mother to come and get him. Defendant then handed the phone back to Banks. Banks did not observe any blood on the phone. Defendant left. Banks hit redial on the phone and the call was answered by a person who identified herself as defendant's mother. Banks then observed several police cars speed past his house. He called 911 to report his encounter with defendant.

¶ 9　　At approximately 10:30 p.m., police officers received call with a description of the offender on the radio. One officer testified that he and his partner observed an individual matching the description. They pulled over, announced their office, and asked defendant to come over, but defendant fled on foot. The officer's partner gave chase on foot, but they did not take him into custody. The officer radioed that defendant was running. Another officer testified that he received the description and toured the area. He observed defendant behind some bushes near a retirement home. When the officer announced his office, defendant fled around the building. Lieutenant Ryan then arrived at the scene. Defendant was taken into custody by the officer, and Lieutenant Ryan read defendant his *Miranda* rights. Defendant told Lieutenant Ryan that he was coming from his girlfriend's house on Bell, and when asked what happened, defendant said he was "just defending myself."

¶ 10　　Forensic scientists testified that DNA samples were taken from defendant's pants and compared to DNA profiles of the victims. The scientist testified that a DNA profile taken from one clipping of defendant's pants matched Stacy's DNA profile within a reasonable degree of scientific certainty. This DNA profile would be expected to occur in approximately 1 in 11 quadrillion black, 1 in 210 quadrillion white, or 1 in 15 quadrillion Hispanic unrelated individuals. A second clipping from defendant's pants matched Joi's DNA profile within a

reasonable degree of scientific certainty. This DNA profile would be expected to occur in approximately 1 in 6.7 quadrillion black, 1 in 220 quadrillion white, or 1 in 100 quadrillion Hispanic unrelated individuals. A third mixed sample from defendant's pants could not exclude Jade, but could exclude Stacy and Joi. The DNA profile could be expected to occur in approximately 1 in 520 million black, 1 in 1.7 billion white, or 1 in 700 million Hispanic individuals. The medical examiner testified that all victims suffered multiple stab wounds, which were fatal, and the manner of death was homicide. Specifically, he testified that Jade suffered 22 stab wounds, Stacy suffered 38 wounds, and Joi suffered 12 wounds. He also stated that Jade had ligature marks around her neck where she was wearing a chain and her jaw bone was fractured.

¶ 11        Thomas Johnson testified that in December 2010, he was an inmate in the Cook County jail with pending cases and was assigned to a cell with defendant for four days. Johnson stated that defendant initially told him he was charged with a shooting but later said he was charged with three murders. According to Johnson, defendant told him that his girlfriend was cheating on him and he "lost it." Defendant said that if he could not have her, then he did not want anyone to have her. Defendant stabbed her with a pocket knife. While he was stabbing Jade, her mother came out with a knife. Defendant then stabbed Stacy and then looked for Joi and stabbed her because he did not want her to identify him. He worried that the neighbors saw him, and he had blood on his clothing. Defendant said he threw away the knife. He told Johnson that he did not feel bad about killing Jade and Stacy, but he felt bad about killing Joi.

¶ 12        Johnson testified that he discussed defendant's defense. Johnson told defendant to plead insanity, but defendant wanted to claim self-defense since Stacy cut his hand. Johnson admitted that he planned to use his testimony to benefit his pending criminal cases, but he did not receive any benefit for his testimony.

¶ 13        A Park Forest police officer testified that in May 2010, he was assigned as a juvenile officer to a domestic battery case involving defendant, who was under 18 at that time, and Jade. After defendant was read his *Miranda* rights, defendant stated that he and Jade had an argument at his house and he prevented her from leaving by grabbing her shirt and he pushed her. The officer observed Jade with a red mark on the right side of her face and a scratch on her neck.

¶ 14        After the State rested, defendant moved for a directed finding, which the trial court denied. Defendant rested without presenting any evidence. Following arguments, the trial court observed that the evidence was "overwhelming" and found defendant guilty of the first degree murders of Jade, Stacy, and Joi.

¶ 15        Subsequently, defendant reported having psychological issues and requested a fitness examination. Defendant was found fit for sentencing. Defendant filed a motion for a new trial, which the trial court denied.

¶ 16        At sentencing, the State presented defendant's birth certificate, showing that he was 18 years old at the time of the murders, and Joi's birth certificate, showing she was 11 years old at the time of her death. The State presented victim impact statements from family members, two of the statements were read before the court. Defendant submitted letters from his mother, grandmother, and grandfather. The State argued for consecutive sentences. Defense counsel conceded that the case required a sentence of natural life and argued for the sentences to run concurrently.

¶ 17    The trial court stated that it reviewed the presentence investigation report and listened to arguments of the attorneys as well as the evidence in aggravation and mitigation. The court then made the following findings.

"The Court would note, as the State has clearly proved, that [defendant] was 18 years old at the time of the commission of these offenses. Consequently, the application of cases such as [*Miller v. Alabama*, 567 U.S. 460 (2012),] out of the United States Supreme Court, [*People v. Davis*, 2014 IL 115595], perhaps even [*People v. Miller*, 202 Ill.2d 328 (2002)], two latter cases from our Illinois Supreme Court, are not by their terms applicable because [defendant] was not a juvenile at the time of this offense, but had attained his majority and was 18 years old when he murdered Jade, Stacy, and Joi.

As both sides point out, there is only one sentence that could be pronounced, configured in one way or another, and that's a sentence of natural life. The Court has no discretion in that regard as required by Section 5-8-1(a)(1)(c)(2) of the Unified Code of Corrections [(730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 2014))] which requires the Court to sentence someone to natural life when they are found guilty of murdering someone under the age of 12, which applies with respect to Joi Cochran, and if they are found guilty of murdering more than one individual, which again is certainly the case here. But beyond pronouncing any sentence, it flows automatically or I should suppose mandatorily under the law, there's still a couple of facts and circumstances that bear noting.

The facts of this case are beyond disquieting. They show a course of conduct that began with what [defendant] did to Jade Hannah, a 17-year-old girl who was stabbed 19 times, was strangled, her jaw fractured while obviously in connection with this incident because when the family from the apartment below saw her minutes earlier she was just fine. The circumstances then show quite clearly that after killing Jade in this manner, after murdering her, [defendant] then stabbed Stacy Cochran, Jade's mother, numerous times close inside the door of the apartment where Stacy lived with her children at 111th and Bell. Stacy sustained 29 stab wounds, 11 incised wounds, which the State pointed out, a total of 38 wounds, an horrific attack. And on top of the horrid nature of that attack, it cannot be ignored, cannot be not noted [*sic*] that at the time she was attacked in this manner she was literally hobbled; she was on crutches; she was lamed in some manner ***. But she was on crutches and had no more ability to defend herself and her children from [defendant's] attack against them than I do not right now to fly to the moon. Unspeakably cowardly.

And following the vicious assault, the vicious fatal assaults upon Jade and upon Stacy, it is clear from the circumstances of the *** physical evidence that [defendant] then turned his attention to Joi Cochran, 11 years old, 4-foot, 11 inches tall, 98 pounds, as evinced by the testimony of the medical examiner, who then suffered nine stab wounds, three incised wounds. A course of conduct that is beyond craven, it is beyond my ability to express with any accuracy the horror inflicted on those ladies, those women, those children at that time and that lingers forever after in the hearts and minds of their loved ones, their family, and their friends.

It has to be said, [defendant], that what you did on November 29, 2010 reveals with certainty and without exception the depth and breadth of the darkness of your heart,

your extraordinary narcissism, and the criminal selfishness that more than justifies the sentence that is required by the law, a sentence of natural life."

¶ 18    The trial court then sentenced defendant to a term of natural life on each of the counts of murder, to run concurrently.

¶ 19    This appeal followed.

¶ 20    On appeal, defendant argues that his mandatory natural life sentence as applied in his case violates the eighth amendment of the United States Constitution (U.S. Const., amend. VIII) and the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) because the sentence was mandated without a consideration of defendant's age and other mitigating factors. Pursuant to section 5-8-1(a)(1)(c)(ii) of the Unified Code of Corrections, defendant was subject to a mandatory term of natural life imprisonment under two bases: he was over the age of 17 and was found guilty of murdering an individual under the age of 12, and that he was found guilty of murdering more than one victim. 730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 2014).

¶ 21    Initially, the State asserts that defendant failed to preserve his sentencing challenges and is forfeited from raising them before this court. "It is well settled that, to preserve a claim of sentencing error, both a contemporaneous objection and a written postsentencing motion raising the issue are required." *People v. Hillier*, 237 Ill. 2d 539, 544 (2010). Defendant did not object or file a postsentencing motion. Therefore, we review defendant's claims under plain error.

¶ 22    Illinois Supreme Court Rule 615(a) (eff. Jan. 1, 1967) provides that "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." "In the sentencing context, a defendant must then show either that (1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious as to deny the defendant a fair sentencing hearing." *Hillier*, 237 Ill. 2d at 545. Defendant bears the burden of persuasion under both prongs. *Id.* For the reasons that follow, we find no clear or obvious error occurred in imposing defendant's sentence.

¶ 23    The eighth amendment to the United States Constitution, applicable to the states via the fourteenth amendment, bars cruel and unusual punishment, namely punishment that is "inherently barbaric" or is disproportionate to the offense. *Graham v. Florida*, 560 U.S. 48, 59 (2010). The proportionate penalties clause requires that sentences should be determined " 'both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship.' " *People v. Rizzo*, 2016 IL 118599, ¶ 28 (quoting Ill. Const. 1970, art. I, § 11).

¶ 24    " 'Constitutional challenges carry the heavy burden of successfully rebutting the strong judicial presumption that statutes are constitutional.' " *Id.* ¶ 23 (quoting *People v. Patterson*, 2014 IL 115102, ¶ 90). "That presumption applies with equal force to legislative enactments that declare and define conduct constituting a crime and determine the penalties imposed for such conduct." *Id.* " 'To overcome this presumption, the party challenging the statute must clearly establish that it violates the constitution.' " *Id.* (quoting *People v. Sharpe*, 216 Ill. 2d 481, 487 (2005)). "Courts have a duty to uphold the constitutionality of a statute whenever reasonably possible, resolving any doubts in favor of the statute's validity." *Id.* " 'An as-applied challenge requires a showing that the statute violates the constitution as it applies to the facts and circumstances of the challenging party. [Citation.] In contrast, a facial challenge

requires a showing that the statute is unconstitutional under any set of facts, *i.e.*, the specific facts related to the challenging party are irrelevant.' " *Id.* ¶ 24 (quoting *People v. Thompson*, 2015 IL 118151, ¶ 36).

¶ 25     Defendant first contends that his mandatory natural life imprisonment violates the eighth amendment's prohibition of cruel and unusual punishment based on recent United States Supreme Court cases analyzing the evolution in the imposition of harsh punishments for minors. See *Roper v. Simmons*, 543 U.S. 551 (2005), *Graham*, 560 U.S. 48, *Miller v. Alabama*, 567 U.S. 460 (2012), and *Montgomery v. Louisiana*, 577 U.S. ___, 136 S. Ct. 718 (2016).

> "In *Roper*, the Supreme Court held that the eighth amendment prohibits the death penalty for juvenile offenders. *Roper*, 543 U.S. at 568. The Court reasoned that the 'death penalty is reserved for a narrow category of crimes and offenders,' and that 'juvenile offenders cannot with reliability be classified among the worst offenders.' *Id.* at 569. In *Graham*, the Supreme Court held that the eighth amendment forbids a sentence of life without the possibility of parole for juveniles who did not commit homicide. *Graham*, 560 U.S. at 74 \*\*\*. The Court said that, although the state is not required to release a juvenile during his natural life, the state is forbidden 'from making the judgment at the outset that those offenders never will be fit to reenter society.' *Id.* at 75 \*\*\*. \*\*\* In *Miller*, the Supreme Court held that the eighth amendment prohibits a sentencing scheme that mandates life in prison without the possibility of parole for juvenile offenders, including those convicted of homicide. *Miller*, 567 U.S. at [479-80]. The Court stated that a judge must have the opportunity to look at all of the circumstances involved before determining that life without the possibility of parole is the appropriate penalty. See *id.* at [479-80]." *People v. Harmon*, 2013 IL App (2d) 120439, ¶ 48.

¶ 26     More recently, in *Montgomery*, the Supreme Court clarified its holding in *Miller*, finding that *Miller* "announced a substantive rule that is retroactive in cases on collateral review." *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 732.

> "The [*Montgomery*] Court asserted that '*Miller* requires that before sentencing a juvenile to life without parole, the sentencing judge take into account "how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." ' *Id.* at ___, 136 S. Ct. at 733 (quoting *Miller*, 567 U.S. at [480]). The Court repeated that '*Miller* requires a sentencer to consider a juvenile offender's youth and attendant characteristics before determining that life without parole is a proportionate sentence.' *Id.* at ___, 136 S. Ct. at 734. According to the Court, '[a] hearing where "youth and its attendant characteristics" are considered as sentencing factors is necessary to separate those juveniles who may be sentenced to life without parole from those who may not.' *Id.* at ___, 136 S. Ct. at 735 (quoting *Miller*, 567 U.S. at [465])." *People v. Holman*, 2017 IL 120655, ¶ 38.

¶ 27     The Illinois Supreme Court in *Holman* considered the applicability of *Miller* and *Montgomery* in Illinois.

> "Under *Miller* and *Montgomery*, a juvenile defendant may be sentenced to life imprisonment without parole, but only if the trial court determines that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation. The court may make that decision only after considering the defendant's youth and its attendant characteristics. Those

characteristics include, but are not limited to, the following factors: (1) the juvenile defendant's chronological age at the time of the offense and any evidence of his particular immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the juvenile defendant's family and home environment; (3) the juvenile defendant's degree of participation in the homicide and any evidence of familial or peer pressures that may have affected him; (4) the juvenile defendant's incompetence, including his inability to deal with police officers or prosecutors and his incapacity to assist his own attorneys; and (5) the juvenile defendant's prospects for rehabilitation." *Id.*¶ 46 (citing *Miller*, 567 U.S. at 477-78).

¶ 28    In the present case, it is uncontested that defendant was 18 and was not a minor at the time of the murders. Nevertheless, he asserts that the trial court should have been given the opportunity to consider mitigating factors in imposing the sentence of natural life. Specifically, defendant argues that the trial court was precluded from considering mitigating factors in addition to his youthfulness. He sets forth several claimed mitigating factors, which were included in his presentence investigation, but no testimony was presented nor was any specific argument advanced regarding these factors. According to defendant, the trial court should have been permitted to consider his mental health, including a diagnosis for bipolar disorder, the fact that he had been shot in the chest by a police officer in 2010 during an arrest for aggravated unlawful use of a weapon unrelated to the present case, his history of domestic violence by his father and maternal grandfather in his childhood, exposure to domestic violence against his mother by his father, and no prior criminal convictions before this offense. Defendant contends that the imposition of a mandatory natural life sentence is unconstitutional as applied to his case without considering any of his numerous youth-related mitigating factors. Defendant maintains that his requested relief "does not require this Court to hold that mandatory life sentences is *always* unconstitutional when imposed upon defendants under the age of 21." (Emphasis in original.) We disagree.

¶ 29    There is one significant difference between the imposition of defendant's sentence and the holdings in *Miller* and *Montgomery*, defendant was not a juvenile when he committed the murder of three individuals. Defendant attempts to extend the holdings to "youthful" offenders, but fails to cite any authority in which an eighth amendment violation has been found for an adult offender. Those cases, by their own terms, apply to juvenile offenders, not "youthful" offenders.

¶ 30    Recently, the First Division of this court considered a similar as-applied eighth amendment challenge by an 18-year-old offender in *People v. Thomas*, 2017 IL App (1st) 142557. In that case, the defendant was convicted of first degree murder while using a firearm, attempted first degree murder, and attempted armed robbery. The defendant received a total sentence of 80 years for all offenses. *Id.* ¶ 1. On appeal, the defendant argued that his 80-year sentence represented a *de facto* life sentence in violation of the eighth amendment and the proportionate penalties clause. *Id.* After considering *Roper*, *Graham*, and *Miller* in an as-applied eighth amendment challenge, the reviewing court concluded that the defendant "cannot demonstrate" how his challenge implicated the eighth amendment as an adult defendant. *Id.* ¶ 28. In reaching its conclusion, the court reviewed the Illinois Supreme Court's holding in *People v. Reyes*, 2016 IL 119271, in which the supreme court found that a mandatory 97-year term for a juvenile offender operated as a *de facto* life sentence and implicated *Miller* protections. *Thomas*, 2017 IL App (1st) 142557, ¶ 26 (citing *Reyes*, 2016 IL 119271, ¶¶ 9-10). The *Thomas*

court noted that the Illinois Supreme Court had not indicated that it would extend *Miller* to adult offenders. *Id.* See also *People v. Harris*, 2016 IL App (1st) 141744, ¶ 56, *petition for leave to appeal allowed*, No. 121932 (Ill. May 24, 2017) (finding that the eighth amendment did "not protect" the defendant from a *de facto* life sentence because he was over 18 at the time of the subject offense).

¶ 31    We agree with the court's conclusion in *Thomas* that *Miller* protections under the eighth amendment are not implicated in cases of adult offenders. We find the reasoning equally applicable in this case involving a mandatory sentence of natural life and find no basis to depart from the court's finding. Since defendant has failed to provide any authority to support his assertion that an eighth amendment as-applied challenge under *Miller* can be extended to an adult offender, we reject his constitutional challenge.

¶ 32    Next, we turn to defendant's argument that his sentence should be vacated based on a violation of the proportionate penalties clause of the Illinois Constitution.

¶ 33    The proportionate penalties clause of the Illinois Constitution provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. "While courts of review are generally reluctant to override the judgment of the General Assembly with respect to criminal penalties [citation], it is also true that when defining crimes and their penalties, the legislature must consider the constitutional goals of restoring an offender to useful citizenship and of providing a penalty according to the seriousness of the offense [citation]." (Internal quotation marks omitted.) *People v. Miller*, 202 Ill. 2d 328, 338 (2002). "With regard to the statute at issue, we have recognized that the legislature considered the possible rehabilitation of an offender who commits multiple murder[s], and the seriousness of that offense, in determining that a mandatory minimum sentence of natural life imprisonment is appropriate for the offense of multiple murders." *Id.*

> "We have recognized three different forms of proportionality review. A statute may be deemed unconstitutionally disproportionate if (1) the punishment for the offense is cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community; (2) similar offenses are compared and the conduct that creates a less serious threat to the public health and safety is punished more harshly; or (3) identical offenses are given different sentences." *Id.*

¶ 34    Defendant asserts that the imposition of a mandatory natural life sentence in his case shocks the moral sense of the community. In support, defendant relies on this court's decision in *People v. House*, 2015 IL App (1st) 110580, and the Second Division's decision in *Harris*, 2016 IL App (1st) 141744. The State, on the other hand, argues that this case is more analogous to this court's decision in *People v. Ybarra*, 2016 IL App (1st) 142407. We agree with the State for the following reasons.

¶ 35    In *House*, the defendant was 19 years old with no history of violent crimes and was found guilty under a theory of accountability for the murder of two victims. *House*, 2015 IL App (1st) 110580, ¶ 101. Accordingly, the defendant was sentenced to a mandatory term of natural life under the same statute as defendant in this case, section 5-8-1(a)(1)(c)(ii). 730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 1998). We found significant that the defendant's sentence involved the convergence of the accountability statute and the mandatory natural life sentence. *House*, 2015 IL App (1st) 110580, ¶ 89. We analyzed the reasoning behind the Supreme Court's recent

decisions involving youthful offenders, as well as articles discussing the differences between youth and adults. *Id.* ¶¶ 90-100.

¶ 36　　After considering the facts of the case, the recent Supreme Court decisions, and research on youthful offenders, we concluded that the defendant's sentence was unconstitutional as applied to his case. *Id.* ¶ 101. "Given defendant's age, his family background, his actions as a lookout as opposed to being the actual shooter, and lack of any prior violent convictions, we find that defendant's mandatory sentence of natural life shocks the moral sense of the community." *Id.*

¶ 37　　In contrast, the defendant in *Ybarra* was convicted of the shooting deaths of three teenagers and was subsequently sentenced to a mandatory natural life sentence. The only issue raised on appeal was whether the defendant's sentence violated the proportionate penalties clause. *Ybarra*, 2016 IL App (1st) 142407, ¶ 1. Like defendant in the present case, the defendant in *Ybarra* contended that *House* was applicable in his case. We rejected that contention.

> "We find the instant case distinguishable from *House* based on one significant difference. The defendant in *House* did not pull the trigger, but acted as a lookout and was found guilty under a theory of accountability. Our analysis specifically considered the union of mandatory sentencing with guilt under a theory of accountability. No such union exists in this case. While he was also a young adult at 20 years old, defendant was the person who pulled the trigger repeatedly and killed three teenagers on the street as they left school one afternoon. We cannot equate defendant's actions with our analysis in *House*. For this reason, we find our reasoning in *House* to be inapplicable to defendant's case." *Id.* ¶ 27.

¶ 38　　We see no reason to depart from this conclusion in the present case. As in *Ybarra*, defendant was the perpetrator in the violent stabbing deaths of Jade, Stacy, and Joi. For that reason, the holding in *House* is inapplicable.

¶ 39　　We acknowledge that the reviewing court in *Harris* reached a different result and concluded that the defendant's *de facto* life sentence violated the proportionate penalties clause. *Harris*, 2016 IL App (1st) 141744, ¶¶ 68-69. There, the defendant received a total sentence of 76 years for first degree murder and attempted first degree murder, where 50 years of the sentence was due to mandatory firearm enhancements. *Id.* ¶ 15. In considering the defendant's proportionate penalties challenge, the majority found the case more factually similar to *House* (*id.* ¶¶ 63-64), while the dissent concluded *Ybarra* was more on point (*id.* ¶¶ 83-85 (Mason, J., dissenting)). The majority reasoned that the record showed the defendant's rehabilitative potential and that the trial court expressed "dissatisfaction" with the required minimum sentence to be imposed. *Id.* ¶ 66 (majority opinion). The majority further discussed the effect of the applicable statutes as eliminating the trial court's discretion to construct a sentence with a chance to return the defendant to society. *Id.* ¶¶ 71-72. The dissent maintains that "it is for the legislature, and not the courts, to revisit the sentencing scheme and afford greater discretion to trial judges." *Id.* ¶ 81 (Mason, J., dissenting). The dissent shared the majority's concern over the length of the minimum prison sentence, but found that "the remedy lies with the legislature, not in *ad hoc* determinations made by this court or by trial judges." *Id.* ¶ 82. As noted above, People v. Harris is currently pending in the Illinois Supreme Court. See *People v. Harris*, No. 121932 (Ill. May 24, 2017) (petition for leave to appeal allowed).

¶ 40　　Further, as we did in *Ybarra*, we have reviewed defendant's claims of mitigating factors, including a diagnosis with bipolar disorder, experiencing and witnessing domestic violence, and suffering a gunshot wound to the chest in the course of an arrest. We appreciate

defendant's struggles with mental illness, but we note that defendant was evaluated and found fit to be sentenced. Defendant was a legal adult when he strangled and stabbed his girlfriend Jade, then stabbed her mother Stacy, who was on crutches, and then stabbed her 11-year-old sister. Given the violent and serious nature of these murders, a mandatory sentence of natural life does not shock the moral sense of the community and does not violate the proportionate penalties clause of the Illinois Constitution.

¶ 41 Additionally, the trial court findings suggest that the court would have imposed the same sentence if it had discretion. During sentencing, the trial court stated:

"what you did on November 29, 2010 reveals with certainty and without exception the depth and breadth of the darkness of your heart, your extraordinary narcissism, and the criminal selfishness that *more than justifies the sentence that is required by the law, a sentence of natural life*." (Emphasis added.)

¶ 42 The trial court's finding further supports our conclusion that defendant's mandatory natural life sentence does not shock the moral sense of community and does not violate the proportionate penalties clause. Until we receive further guidance from the Illinois Supreme Court or the legislature amends the sentencing statutes, we must affirm the imposition of a natural life sentence in this case.

¶ 43 Based on the foregoing reasons, we affirm the decision of the circuit court of Cook County.

¶ 44 Affirmed.