2022 IL App (1st) 191703-U

THIRD DIVISION
November 2, 2022

No. 1-19-1703

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 11 CR 00155 |
| | ) | |
| DENZEL PITTMAN, | ) | Honorable |
| | ) | Timothy J. Joyce, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

PRESIDING JUSTICE McBRIDE delivered the judgment of the court.
Justices Gordon and Burke concurred in the judgment.

**ORDER**

¶ 1    *Held*:  (1) Defendant forfeited his proportionate penalties sentencing claim by failing to raise the issue in his *pro se* postconviction petition. Even if not forfeited, defendant's claim was previously raised on direct appeal and is barred by *res judicata*; and (2) defendant failed to set forth an arguable claim of ineffective assistance of trial counsel.

¶ 2    Defendant Denzel Pittman appeals the trial court's first stage dismissal of his *pro se* postconviction petition arguing that he set forth the gist of a constitutional claim. Specifically, he contends that: (1) his mandatory natural life sentence is unconstitutional under the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) because he was 18 years

old when the offenses were committed; and (2) his trial counsel was ineffective for failing to properly review pretrial discovery material and object to the tainted chain of custody for defendant's boots.

¶ 3       Following a bench trial, defendant Denzel Pittman was found guilty in the November 2010 first degree murders of his girlfriend Jade Hannah, age 17; her mother Stacy Cochran, age 43; and her younger sister Joi Cochran, age 11. The trial court subsequently sentenced defendant to a mandatory term of natural life in prison.

¶ 4       A bench trial was conducted in March 2015. The victims' deaths occurred at their residence, located at West 111th Street and South Bell Avenue in Chicago. We previously discussed the evidence presented at defendant's trial in his direct appeal as follows. *People v. Pittman*, 2018 IL App (1st) 152030, ¶¶ 3-13.

> "The victims lived in a second floor apartment of a multiunit building comprised of six apartments, with two apartments on each floor. *** Linda Abraham lived on the second floor across the hall from the victims. The Thompson family, comprised of Arthur and Sherry Thompson, their daughter Courtney, and Courtney's son, lived in the first floor unit underneath Abraham's apartment.
>
> On November 29, 2010, at approximately 9:40 p.m., Courtney Thompson arrived home from work and observed Jade sitting on the steps between the first and second floors with defendant. Courtney went into her apartment and heard Jade and defendant talking, but could not understand what they were saying. She began to work on a computer near the front door of the apartment. Her parents were in their bedroom watching television. A short time later, all three heard screams and a female child calling for her mother. Arthur got out of bed and

opened the front door to the apartment. The screams had stopped when he opened the door. He immediately directed his wife to call 911. All three came into the hall and observed Jade lying face down on the landing between the first and second floors. Sherry was a nurse, and she attempted to resuscitate Jade after determining that Jade did not have a pulse. When Sherry turned Jade over, she observed stab wounds in her neck and chest. As she attempted CPR, Sherry noticed air coming from the stab wounds.

As Sherry was working on Jade, defendant came out of the victims' apartment and closed the door. He asked Sherry if the police had been called and if they saw who did it. He said he was going to find the offender. Courtney and Arthur observed blood on defendant's clothing. As he was leaving, he came back to retrieve his jacket, which was on the banister in the hallway. The Thompsons gave a description of the offender to police. Courtney and Arthur subsequently identified defendant as the individual leaving the victims' apartment in separate viewings of a lineup.

Abraham testified that she heard screams in her apartment and thought it was children playing. She went to her door and looked out her peephole. She observed a young man from the side with his fist moving rapidly up and down. She stated that it looked like the man was punching someone, but she was unable to see who or what he was punching. Abraham said the young man was holding up the person with his other hand. She did not observe a knife. She described the young man as African-American and medium height. As she watched, she observed the young man move out of sight into the apartment. She stepped away

3

from the door to change into clothing from nightwear. While she changed, she heard screaming from the back of the victims' apartment. She then looked through the peephole and saw the young man and did not hear any screaming. She testified that she was 'distraught.' She waited to open the door until it was quiet. When she opened the door, she heard voices that she recognized as the Thompsons. She came out and observed blood on the wall. She also observed Sherry attempting to resuscitate Jade. When the police arrived, they directed the officers to the apartment.

Lieutenant Michael Ryan arrived on the scene right behind the paramedics. The paramedics immediately began to work on Jade but indicated to him that she was deceased. He went to the apartment and knocked. When he received no response, he entered the unit. He observed Stacy 'laying in a pool of blood' just inside the unit. There were crutches nearby, which was later explained was due to Stacy's recent surgery. He went to the back of the apartment and observed Joi's legs also 'in a pool of blood.' He and an officer went through the apartment and determined that no one else was present. He stationed officers outside the apartment to keep the scene secure until the forensic team arrived. He then responded to a radio call of a sighting of the suspect. A forensic officer testified that the back door to the unit was closed and locked, stating that one of the locks required a key to open and the key was not present to open the door. He subsequently found a key and observed no damage to the door.

Joseph Banks testified that he lived about three blocks from the scene. On November 29, 2010, at around 10:30 p.m., he was watching television with his

4

wife when defendant walked up to their house and knocked on the door. He opened the inner door but left the outer door closed. He observed defendant as dirty, shaking, and out of breath. Defendant told Banks that he had lost his keys and asked to use their phone to make a call. Banks passed a phone to defendant on the porch. He heard defendant tell his mother to come and get him. Defendant then handed the phone back to Banks. Banks did not observe any blood on the phone. Defendant left. Banks hit redial on the phone and the call was answered by a person who identified herself as defendant's mother. Banks then observed several police cars speed past his house. He called 911 to report his encounter with defendant.

At approximately 10:30 p.m., police officers received call with a description of the offender on the radio. One officer testified that he and his partner observed an individual matching the description. They pulled over, announced their office, and asked defendant to come over, but defendant fled on foot. The officer's partner gave chase on foot, but they did not take him into custody. The officer radioed that defendant was running. Another officer testified that he received the description and toured the area. He observed defendant behind some bushes near a retirement home. When the officer announced his office, defendant fled around the building. Lieutenant Ryan then arrived at the scene. Defendant was taken into custody by the officer, and Lieutenant Ryan read defendant his *Miranda* rights. Defendant told Lieutenant Ryan that he was coming from his girlfriend's house on Bell, and when asked what happened, defendant said he was 'just defending myself.'

5

Forensic scientists testified that DNA samples were taken from defendant's pants and compared to DNA profiles of the victims. The scientist testified that a DNA profile taken from one clipping of defendant's pants matched Stacy's DNA profile within a reasonable degree of scientific certainty. This DNA profile would be expected to occur in approximately 1 in 11 quadrillion black, 1 in 210 quadrillion white, or 1 in 15 quadrillion Hispanic unrelated individuals. A second clipping from defendant's pants matched Joi's DNA profile within a reasonable degree of scientific certainty. This DNA profile would be expected to occur in approximately 1 in 6.7 quadrillion black, 1 in 220 quadrillion white, or 1 in 100 quadrillion Hispanic unrelated individuals. A third mixed sample from defendant's pants could not exclude Jade, but could exclude Stacy and Joi. The DNA profile could be expected to occur in approximately 1 in 520 million black, 1 in 1.7 billion white, or 1 in 700 million Hispanic individuals. The medical examiner testified that all victims suffered multiple stab wounds, which were fatal, and the manner of death was homicide. Specifically, he testified that Jade suffered 22 stab wounds, Stacy suffered 38 wounds, and Joi suffered 12 wounds. He also stated that Jade had ligature marks around her neck where she was wearing a chain and her jaw bone was fractured.

Thomas Johnson testified that in December 2010, he was an inmate in the Cook County jail with pending cases and was assigned to a cell with defendant for four days. Johnson stated that defendant initially told him he was charged with a shooting but later said he was charged with three murders. According to Johnson, defendant told him that his girlfriend was cheating on him and he 'lost it.'

6

Defendant said that if he could not have her, then he did not want anyone to have her. Defendant stabbed her with a pocket knife. While he was stabbing Jade, her mother came out with a knife. Defendant then stabbed Stacy and then looked for Joi and stabbed her because he did not want her to identify him. He worried that the neighbors saw him, and he had blood on his clothing. Defendant said he threw away the knife. He told Johnson that he did not feel bad about killing Jade and Stacy, but he felt bad about killing Joi.

Johnson testified that he discussed defendant's defense. Johnson told defendant to plead insanity, but defendant wanted to claim self-defense since Stacy cut his hand. Johnson admitted that he planned to use his testimony to benefit his pending criminal cases, but he did not receive any benefit for his testimony.

A Park Forest police officer testified that in May 2010, he was assigned as a juvenile officer to a domestic battery case involving defendant, who was under 18 at that time, and Jade. After defendant was read his *Miranda* rights, defendant stated that he and Jade had an argument at his house and he prevented her from leaving by grabbing her shirt and he pushed her. The officer observed Jade with a red mark on the right side of her face and a scratch on her neck." *Id.*

¶ 5    Defendant did not present any evidence in his defense. Following arguments, the trial court observed that the evidence was "overwhelming" and found defendant guilty of the first degree murders of Jade, Stacy, and Joi.

¶ 6    At the sentencing hearing, defendant's birth certificate was presented to the court, showing he was 18 years old at the time of the offense. Joi's birth certificate was also presented

7

and showed she was 11 years old at the time of her death. In its findings, the trial court noted that the State "clearly proved" that defendant was 18 at the time of the commission of the offenses. The court observed that defendant was subject to mandatory natural life sentence under two bases, the murder of a person under age 12, and the murder of more than one person. The court sentenced defendant to a term of natural life on each of the counts of murder, to run concurrently. In imposing this sentence, the court detailed its findings.

"The facts of this case are beyond disquieting. They show a course of conduct that began with what [defendant] did to Jade Hannah, a 17-year-old girl who was stabbed 19 times, was strangled, her jaw fractured while obviously in connection with this incident because when the family from the apartment below saw her minutes earlier she was just fine. The circumstances then show quite clearly that after killing Jade in this manner, after murdering her, [defendant] then stabbed Stacy Cochran, Jade's mother, numerous times close inside the door of the apartment where Stacy lived with her children at 111th and Bell. Stacy sustained 29 stab wounds, 11 incised wounds, which the State pointed out, a total of 38 wounds, an horrific attack. And on top of the horrid nature of that attack, it cannot be ignored, cannot be not noted [sic] that at the time she was attacked in this manner she was literally hobbled; she was on crutches; she was lamed in some manner ***. But she was on crutches and had no more ability to defend herself and her children from [defendant's] attack against them than I do not right now to fly to the moon. Unspeakably cowardly.

And following the vicious assault, the vicious fatal assaults upon Jade and upon Stacy, it is clear from the circumstances of the *** physical evidence that

8

[defendant] then turned his attention to Joi Cochran, 11 years old, 4-foot, 11 inches tall, 98 pounds, as evinced by the testimony of the medical examiner, who then suffered nine stab wounds, three incised wounds. A course of conduct that is beyond craven, it is beyond my ability to express with any accuracy the horror inflicted on those ladies, those women, those children at that time and that lingers forever after in the hearts and minds of their loved ones, their family, and their friends.

It has to be said, [defendant], that what you did on November 29, 2010 reveals with certainty and without exception the depth and breadth of the darkness of your heart, your extraordinary narcissism, and the criminal selfishness that more than justifies the sentence that is required by the law, a sentence of natural life." *Id*. ¶ 17.

¶ 7       Defendant raised one claim on direct appeal, an as-applied challenge that his mandatory natural life sentence violated the eighth amendment of the United States Constitution (U.S. Const., amend. VIII) and the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11). *Id*. ¶ 20. Specifically, he contended his sentence was unconstitutional under *Miller v. Alabama*, 567 U.S. 460 (2012), and its progeny because the sentence was mandated without a consideration of defendant's age and other mitigating factors. *Id*. This court rejected defendant's eighth amendment challenge and held that *Miller* protections under the eighth amendment are not implicated in the case of a defendant, aged 18 or over. *Id*. ¶ 31. This Court further rejected the proportionate penalties clause challenge and found it significant that defendant "was the perpetrator in the violent stabbing deaths of Jade, Stacy, and Joi." *Id*. at ¶¶ 32-39.

¶ 8    Additionally, we reviewed defendant's mitigating factors as well as the aggravating factors of the crime and concluded that "a mandatory sentence of natural life does not shock the moral sense of the community and does not violate the proportionate penalties clause of the Illinois Constitution." *Id.* ¶ 40. Finally, this court observed the trial court's findings suggested that the court would have imposed a natural life sentence even if it had discretion. *Id.* ¶ 41.

¶ 9    In May 2019, defendant filed his *pro se* postconviction petition which raised multiple claims of prosecutorial misconduct, ineffective assistance of trial and appellate counsel, trial court error, improper sentencing, and cumulative error. In support of his claims, defendant attached his own affidavit, as well as affidavits from his mother and grandparents. He also attached several supporting documents, including a page from his arrest report containing a narrative of the arrest; the forensic investigator's crime scene processing report; the forensic evidence submission form; laboratory report; the trial prosecutor's sentencing memorandum; cases and statutes; and excerpts from the trial record. In July 2019, the trial court summarily dismissed defendant's petition in a written order which thoroughly detailed the court's findings for each claim alleged by defendant.

¶ 10    This appeal followed.

¶ 11    The Post-Conviction Act (725 ILCS 5/122-1 through 122-8 (West 2018)) provides a tool by which those under criminal sentence in this state can assert that their convictions were the result of a substantial denial of their rights under the United States Constitution or the Illinois Constitution or both. 725 ILCS 5/122-1(a) (West 2018); *People v. Coleman*, 183 Ill. 2d 366, 378-79 (1998). Postconviction relief is limited to constitutional deprivations that occurred at the original trial. *Coleman*, 183 Ill. 2d at 380. "A proceeding brought under the [Post-Conviction Act] is not an appeal of a defendant's underlying judgment. Rather, it is a collateral attack on the

judgment." *People v. Evans*, 186 Ill. 2d 83, 89 (1999). "The purpose of [a postconviction] proceeding is to allow inquiry into constitutional issues relating to the conviction or sentence that were not, and could not have been, determined on direct appeal." *People v. Barrow*, 195 Ill. 2d 506, 519 (2001). Thus, *res judicata* bars consideration of issues that were raised and decided on direct appeal, and issues that could have been presented on direct appeal, but were not, are considered forfeited. *People v. English*, 2013 IL 112890, ¶ 22.

¶ 12    At the first stage, the circuit court must independently review the postconviction petition within 90 days of its filing and determine whether "the petition is frivolous or is patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2018). "A postconviction petition is frivolous or patently without merit when its allegations, taken as true and liberally construed, fail to present the gist of a constitutional claim." *People v. Harris*, 224 Ill. 2d 115, 126 (2007). A petition is frivolous or patently without merit only if it has no arguable basis in law or fact. *People v. Hodges*, 234 Ill. 2d 1, 16 (2009). A petition lacks an arguable basis in law or fact if it is "based on an indisputably meritless legal theory," such as one that is "completely contradicted by the record," or "a fanciful factual allegation," including "those which are fantastic or delusional." *Id.* at 16-17.

¶ 13    If the court determines that the petition is either frivolous or patently without merit, the court must dismiss the petition in a written order. 725 ILCS 5/122-2.1(a)(2) (West 2018). At the dismissal stage of a postconviction proceeding, the trial court is concerned merely with determining whether the petition's allegations sufficiently demonstrate a constitutional infirmity that would necessitate relief under the Act. *Coleman*, 183 Ill. 2d at 380. The circuit court is not permitted to engage in any fact-finding or credibility determinations. *Id.* at 385. At this stage of the proceedings, we are to accept well-pleaded factual allegations of a postconviction petition

and its supporting evidence as true unless they are positively rebutted by the record of the original trial proceedings. *Sanders*, 2016 IL 118123, ¶ 48. We disregard any legal conclusions unsupported by allegations of fact. *People v. Wilborn*, 2011 IL App (1st) 092802, ¶ 48.

¶ 14       On appeal, defendant argues that the trial court erred in dismissing his petition. He first contends that: (1) under *Miller*, he may challenge his natural life sentence for offenses committed when he was 18, and (2) his sentencing claim is not barred by *res judicata* due to the evolution of the caselaw surrounding the sentencing of young adult offenders. Defendant also asserts that his trial counsel was ineffective for failing to familiarize himself with pretrial discovery, and specifically, for failing to discover that defendant's boots were open to potential contamination after being placed into evidence by the police. Defendant has not challenged the remaining claims presented in his petition on appeal and has therefore forfeited those claims. *People v. Munson*, 206 Ill. 2d 104, 113 (2002) (concluding that the petitioner abandoned several postconviction claims by failing to raise them on appeal); see also Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing").

¶ 15       However, before we reach the merits of defendant's sentencing claim under *Miller*, we must first consider whether defendant's claim has been properly raised before this court. The State contends that defendant's sentencing claim was not alleged in his petition and, thus, he cannot raise a new claim on appeal.

¶ 16       Generally, Illinois courts have held that a claim not raised in the postconviction petition cannot be raised for the first time on appeal.  See *People v. Pendleton*, 223 Ill. 2d 458, 475 (2006); *People v. Jones*, 213 Ill. 2d 498, 505 (2004). Section 122-2 of the Post-Conviction Act specifically provides that "the petition shall *** clearly set forth the respect in which petitioner's

constitutional rights were violated," and, section 122-3 provides that "[a]ny claim of substantial denial of constitutional rights not raised in the original or amended petition is waived" (725 ILCS 5/122-2 (West 2016); 725 ILCS 5/122-3 (West 2016)). While our supreme court may relax the forfeiture rule by invoking its supervisory power, this court "is not free, *** to excuse, in the context of postconviction proceedings, an appellate waiver caused by the failure of a defendant to include issues in his or her postconviction petition." *Jones*, 213 Ill. 2d at 508.

¶ 17    In his petition, defendant asserted that the first degree murder statute (720 ILCS 5/9-1 (West 2010)) "originated from" Public Act 84-1450, which violated the *ex post facto* clause of the Illinois Constitution, citing *People v. Shumpert*, 126 Ill. 2d 344 (1989). He also contended that the first degree murder statute was never properly reenacted because Public Act 89-428 violated the single subject rule of the Illinois Constitution, citing *Johnson v. Edgar*, 176 Ill. 2d 499 (1997). Defendant further argued that he was improperly sentenced to natural life because the sentencing statute (730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 2014)) was held in violation of the single subject rule of the Illinois Constitution and never properly reenacted, citing *People v. Wooters*, 188 Ill. 2d 500 (1999) and *People v. Quevedo*, 403 Ill. App. 3d 282 (2010). The trial court found both claims were frivolous and patently without merit. Defendant did not raise any claim about his sentence based on *Miller* and its progeny in his petition.

¶ 18    However, in his brief before this court, defendant contends for the first time that his natural life sentence violates the proportionate penalties clause of the Illinois Constitution because he was 18 at the time of the offenses. He has abandoned the sentencing claims alleged in his petition. Defendant does not address his failure to have presented the *Miller*-related claim in his petition in either his opening or reply briefs. Because defendant's petition did not challenge his sentence under *Miller*, any argument on this ground has been forfeited. See *Pendleton*, 223

Ill. at 475; *Jones*, 213 Ill. 2d at 506; 725 ILCS 5/122-3 (West 2018). As the supreme court has admonished, this court does not possess the supervisory powers of the supreme court and cannot reach postconviction claims not raised in the initial petition. *Jones*, 213 Ill. 2d at 507.

¶ 19    Moreover, even if defendant had raised a *Miller* claim in his petition, this argument would be barred under the doctrine of *res judicata*. As previously observed, *res judicata* bars consideration of postconviction issues that were raised and decided on direct appeal, and issues that could have been presented on direct appeal, but were not, are considered forfeited. *English*, 2013 IL 112890, ¶ 22.

¶ 20    As we previously discussed, the sole issue raised on direct appeal was whether defendant's mandatory natural life sentence violated the eighth amendment of the United States Constitution and the proportionate penalties clause of the Illinois Constitution because he was only 18 years old at the time he committed the murders. *Pittman*, 2018 IL App (1st) 152030, ¶ 1. Defendant argued that the trial court should have been able to consider the mitigating factors set forth in his presentence investigation.

> "Specifically, defendant argues that the trial court was precluded from considering mitigating factors in addition to his youthfulness. He sets forth several claimed mitigating factors, which were included in his presentence investigation, but no testimony was presented nor was any specific argument advanced regarding these factors. According to defendant, the trial court should have been permitted to consider his mental health, including a diagnosis for bipolar disorder, the fact that he had been shot in the chest by a police officer in 2010 during an arrest for aggravated unlawful use of a weapon unrelated to the present case, his history of domestic violence by his father and maternal

14

grandfather in his childhood, exposure to domestic violence against his mother by his father, and no prior criminal convictions before this offense." *Id.* ¶ 28.

¶ 21    This court rejected defendant's eighth amendment challenge and held that *Miller* protections under the eighth amendment are not implicated in the case of a defendant, aged 18 or over. *Id.* ¶ 31. After considering *People v. House*, 2015 IL App (1st) 110580, *People v. Harris*, 2016 IL App (1st) 141744, and *People v. Ybarra*, 2016 IL App (1st) 142407, this Court rejected the proportionate penalties clause challenge and found it significant that defendant "was the perpetrator in the violent stabbing deaths of Jade, Stacy, and Joi." *Id.* at ¶¶ 32-39.

¶ 22    In our analysis on defendant's claim, we also reviewed defendant's mitigating factors as well as the aggravating factors of the crime.

> "we have reviewed defendant's claims of mitigating factors, including a diagnosis with bipolar disorder, experiencing and witnessing domestic violence, and suffering a gunshot wound to the chest in the course of an arrest. We appreciate defendant's struggles with mental illness, but we note that defendant was evaluated and found fit to be sentenced. Defendant was a legal adult when he strangled and stabbed his girlfriend Jade, then stabbed her mother Stacy, who was on crutches, and then stabbed her 11-year-old sister. Given the violent and serious nature of these murders, a mandatory sentence of natural life does not shock the moral sense of the community and does not violate the proportionate penalties clause of the Illinois Constitution." *Id.* ¶ 40.

¶ 23    Additionally, this court observed the trial court's findings suggested that the court would have imposed a natural life sentence even if the court had discretion at the time of sentencing. The trial court stated:

"what you did on November 29, 2010 reveals with certainty and without exception the depth and breadth of the darkness of your heart, your extraordinary narcissism, and the criminal selfishness that *more than justifies the sentence that is required by the law, a sentence of natural life*." (Emphasis in original.) *Id*. ¶ 41.

¶ 24 Defendant attempts to avoid the bar of *res judicata* by arguing that it should be relaxed based on new case law regarding youthful offenders that was not available at the time of defendant's direct appeal. The doctrine of *res judicata* may be relaxed when "fundamental fairness so requires." *English*, 2013 IL 112890, ¶ 22. Defendant focuses on the decisions in *People v. Harris*, 2018 IL 121932, *People v. House*, 2021 IL 125124, and *People v. Wilson*, 2022 IL App (1st) 192048, to argue in support of fundamental fairness. According to defendant, these cases show that: (1) the trial court erred in holding that *Miller* did not apply because he was 18 and must be sentenced as an adult, (2) this Court erred on direct appeal in considering his proportionate penalties claim on an undeveloped record; and (3) the postconviction court erred in summarily dismissing his petition. Again, defendant fails to acknowledge that this *Miller* claim was not raised in his petition.

¶ 25 Although these cases were not available at the time of defendant's direct appeal, he has failed to establish that fundamental fairness requires this court to relax the bar of *res judicata*. In *Harris*, the supreme court held that *Miller* protections under the eighth amendment are not implicated in the case of a defendant, aged 18 or over. *Harris*, 2018 IL 121932, ¶¶ 54-61. The supreme court in *Harris* also recognized that an as-applied proportionate penalties challenge of a youthful offender may properly be raised in a postconviction proceeding where the defendant has the opportunity to sufficiently develop the record to support his claim. *Id*. ¶¶ 41, 48. The supreme court in *House* reiterated its holding in *Harris* which "focused on development of the

16

record in the trial court, not whether the challenge is raised in a collateral proceeding or on appeal ***." *House*, 2021 IL 125124, ¶ 31. Thus, the crux of both *Harris* and *House* is for a youthful offender to develop a record before the trial court in support of a proportionate penalties sentencing claim.

¶ 26  Defendant also relies significantly on *Wilson*, but we find that case easily distinguishable from the present case. There, the defendant's *pro se* postconviction petition alleged a claim of ineffective assistance of counsel for failing to investigate a witness, which the trial court dismissed at the first stage. *Wilson*, 2022 IL App (1st) 192048, ¶ 40. On appeal, the reviewing court concluded that none of the defendant's factual allegations could be viewed as fantastic and delusional, and if presented at trial, the testimony would have corroborated the defendant's version of events. Based on this conclusion, the reviewing court remanded for a second stage proceedings and the appointment of counsel. *Id*. On remand, postconviction counsel amended the defendant's petition to include a claim that the defendant's *de facto* life sentence violated the proportionate penalties clause. *Id.* ¶ 42. In support, the defendant "provided over 140 pages of attachments in support of his proportionate penalties claim, including affidavits, school evaluations, DCFS records, and certificates of achievement he earned while in prison." *Id.* ¶ 51. After reviewing the defendant's supporting documents and the arguments by the parties, the *Wilson* court found the defendant made a substantial showing of constitutional violation and remanded for an evidentiary hearing. *Id.* ¶¶ 101-102.

¶ 27  While these cases support the viability of a youthful offender, such as defendant, to raise an as-applied proportionate penalties sentencing claim, none of these cases held that a *Miller*-related sentencing claim may be brought for the first time on appeal. Nor did these cases suggest that a reviewing court should remand to develop a record on a claim previously not raised in the

trial court. Unlike in this case, the defendant in *Wilson* properly raised his sentencing claim at the second stage after a remand for further proceedings. This case is more akin to the defendant in *Harris*, where the supreme court dismissed the defendant's sentencing claim raised on direct appeal without a supporting record and explained that he was not foreclosed from raising this claim in a future collateral proceeding. *Harris*, 2018 IL 121932, ¶ 48. As discussed above, the only sentencing claim raised in defendant's petition was that he was improperly sentenced pursuant to an unconstitutional statute. Unlike in *Wilson*, defendant's petition lacks any supporting documentation for an as-applied proportionate penalties claim. We find that defendant's reliance on these cases does not support a relaxation of *res judicata* based on fundamental fairness in this case. Since defendant's claim was previously considered on direct appeal, we hold that it is barred by *res judicata*.

¶ 28    Next, defendant argues that his trial counsel was ineffective for failing to familiarize himself with and properly utilize pretrial discovery material. We again note that although defendant raised multiple claims of ineffective assistance of counsel in his petition, he has not challenged these additional claims on appeal. Accordingly, these claims have been forfeited. See *Munson*, 206 Ill. 2d at 113; see also Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing").

¶ 29    Defendant relies on the crime scene processing report to assert that his trial counsel should have challenged the chain of custody of his boots. The narrative section of the crime scene processing report stated that "R/FI then proceeded to [the crime scene] to confer with BT 5805 PFI D. Fanelli #4809 and PFI Z. Niewdach #17629. R/FI showed BT 5805 the pair of shoe boots recovered from suspect Pittman." According to defendant, this report indicated a problem

with the chain of custody and counsel should have argued that any blood-related evidence recovered from defendant's boots was contaminated and tainted. In response, the State maintains that defendant cannot establish he was arguably prejudiced by counsel's alleged error because the forensic analysis report attached to defendant's petition showed that no blood was indicated on the boots. Additionally, defendant's presence at the scene of the homicides was well-established based on his identification by the Thompsons.

¶ 30    Claims of ineffective assistance of counsel are resolved under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the Supreme Court delineated a two-part test to use when evaluating whether a defendant was denied the effective assistance of counsel in violation of the sixth amendment. Under *Strickland*, a defendant must demonstrate that counsel's performance was deficient and that such deficient performance substantially prejudiced defendant. *Strickland*, 466 U.S. at 687. To demonstrate performance deficiency, a defendant must establish that counsel's performance fell below an objective standard of reasonableness. *People v. Edwards*, 195 Ill. 2d 142, 163 (2001). "A defendant is entitled to reasonable, not perfect, representation, and mistakes in strategy or in judgment do not, of themselves, render the representation incompetent." *People v. Fuller*, 205 Ill. 2d 308, 331 (2002). "Counsel's strategic choices are virtually unchallengeable. Thus, the fact that another attorney might have pursued a different strategy, or that the strategy chosen by counsel has ultimately proved unsuccessful, does not establish a denial of the effective assistance of counsel." *Id*.

¶ 31    In evaluating sufficient prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the

outcome." *Strickland*, 466 U.S. at 694. If a case may be disposed of on the ground of lack of sufficient prejudice, that course should be taken, and the court need not ever consider the quality of the attorney's performance. *Strickland*, 466 U.S. at 697. "*Strickland* requires actual prejudice be shown, not mere speculation as to prejudice." *People v. Bew*, 228 Ill. 2d 122, 135 (2008). At the first stage of postconviction proceedings, a petition alleging ineffective assistance of counsel may not be dismissed if: (1) counsel's performance arguably fell below an objective standard of reasonableness; and (2) the petitioner was arguably prejudiced as a result. *Hodges*, 234 Ill. 2d at 17.

¶ 32    Defendant fails to cite *Strickland* or the two prong test to evaluate ineffective assistance of counsel. Rather, he only cites general law about postconviction petitions and a single case in support of his argument. However, in that case, *People v. Williams*, 182 Ill. App. 3d 598, 603 (1989), the majority rejected the defendants' claim of ineffective assistance based on a lack of trial preparation. Defendant cited to the dissenting opinion, but failed to indicate that he relied on the dissent. Defendant cites no other authority and offers no reasoned argument as to the ineffective assistance of counsel, improper chain of custody, or lack of trial preparation. A point raised in a brief but not supported by citation to relevant authority fails to satisfy the requirements of Supreme Court Rule 341(h)(7) (eff. May 25, 2018) and is therefore forfeited. *People v. Ward*, 215 Ill. 2d 317, 332 (2005). " ' "[A] reviewing court is entitled to have the issues on appeal clearly defined with pertinent authority cited and a cohesive legal argument presented. The appellate court is not a depository in which the appellant may dump the burden of argument and research." ' " *In re Detention of Lieberman*, 379 Ill. App. 3d 585, 610 (2007) (quoting *In re Marriage of Auriemma,* 271 Ill.App.3d 68, 72 (1994), quoting *Thrall Car Manufacturing Co. v. Lindquist,* 145 Ill.App.3d 712, 719 (1986)); see also *People v. McNutt*,

2020 IL App (1st) 173030, ¶ 81 (finding the defendant's failure to assert a well-reasoned argument was a violation of Supreme Court Rule 341(h)(7)).

¶ 33     Despite this obvious forfeiture, were we to consider the merits of this claim, defendant has failed to establish an arguable claim under either *Strickland* prong. In his petition, defendant attached the laboratory report from the Illinois State Police, which lists the inventory items received by the forensic science center and its findings. The findings for the pair of boots stated, "No blood-like stains noted." Further, during the trial, the stipulation at issue simply listed the items recovered from defendant the night of the homicides.

> "Forensic Investigator Gahagan would also testify that on that date she recovered the clothes that the Defendant was wearing. She would identify People's Group Exhibit Number 26 as those clothes which consist of the following: A black Paris Evvi, E V V I, jacket, one pair of black denim pants, one pair of Hanes black undershorts, one pair of white Joe Boxer thermal underwear pants, one pair of socks, a skullcap, a pair of black boots with laces."

This stipulation was the only reference to defendant's boots at trial. The testimony from the forensic scientist regarding DNA testing was limited to defendant's pants and his jacket, which he has not challenged on appeal.

¶ 34     Defendant offers no argument on how trial counsel was ineffective for failing to challenge the chain of custody for evidence that was not admitted at trial. Defendant has not cited any evidence in the record suggesting that blood was found on his boots. Rather, defendant's supporting documents clearly show that no blood evidence was recovered from his boots and the record establishes that the boots were not admitted at trial. As pointed out above, the only reference at trial was in a list of items recovered from defendant the night of the

murders. Defendant fails to explain how counsel was arguably deficient for failing to object to evidence that was not admitted at trial. " 'Defense counsel is not required to make losing motions or objections in order to provide effective legal assistance.' " *People v. Garcia*, 2021 IL App (1st) 190026, ¶ 27 (quoting *People v. Moore*, 2012 IL App (1st) 100857, ¶ 45, citing *People v. Mercado*, 397 Ill. App. 3d 622, 634 (2009)). Consequently, defendant has not shown how the failure to challenge the chain of custody for evidence that was not used against him at trial could demonstrate an arguable claim that counsel's performance was deficient under *Strickland*. See *Hodges*, 234 Ill. 2d at 17.

¶ 35    Finally, even if trial counsel erred in failing to challenge the chain of custody, which we do not find, defendant cannot establish that he was arguably prejudiced. He does not argue that the result of the proceeding would have been different, absent this alleged error. In light of the overwhelming evidence of defendant's guilt, as detailed above, and defendant's failure to demonstrate, or even allege, prejudice on appeal, his claim of ineffective assistance of counsel fails. It is simply not arguable that counsel's failure to challenge the chain of custody of evidence not introduced against defendant at trial would have resulted in a different outcome. See *Hodges*, 234 Ill. 2d at 17. Because defendant's claim of ineffective assistance of trial counsel lacks merit, the trial court properly dismissed this claim at the first stage.

¶ 36    Based on the foregoing reasons, we affirm the decision of the circuit court of Cook County.

¶ 37    Affirmed.